UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ODILON S. CELESTIN, WIDMIR ROMELIEN, MARIE LUCIE ST VIL, GORETTIE ST VIL, JEANNETTE VALEUS, GUETTY FELIN, HERVE COHEN, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>- against -<br><br>MICHEL JOSEPH MARTELLY, JOCELERME PRIVERT, JOVENEL MOISE, THE WESTERN UNION COMPANY, d/b/a Western Union Holdings, Inc, Western Union Financial Services, Inc., and through other subsidiaries and affiliates, CARIBBEAN AIR MAIL, INC., d/b/a CAM, UNIBANK, S.A., UNITRANSFER USA, INC., UNIGESTION HOLDING, S.A., d/b/a DIGICEL HAITI, NATCOM S.A., and THE GOVERNMENT OF HAITI,<br><br>Defendants. | 18-cv-7340 (LDH) (PK)<br><br>ECF CASE<br><br>**DECLARATION OF JAMES H.R. WINDELS** |

James H.R. Windels declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true:

      1.    I am an attorney duly admitted to practice law in New York and am a partner at Davis Polk & Wardwell LLP.

      2.    I submit this declaration in support of Moving Defendants' motion to dismiss the Second Amended Complaint.

      3.    Attached hereto as Moving Defendants' Exhibit 1 is a true and correct copy of the Second Amended Complaint filed on April 24, 2019.

Dated:    New York, New York
           May 15, 2019

                                      JAMES H.R. WINDELS

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

**ODILON S. CELESTIN, WIDMIR ROMELIEN,**

**MARIE LUCIE ST VIL, GORETTIE ST VIL,**

**JEANNETTE VALEUS, GUETTY FELIN,**

**HERVE COHEN,** and on behalf of all others

similarly situated,

                                            Case No. 18-cv-7340 (LDH) (PK)

        Plaintiffs,

                                        **AMENDED COMPLAINT**

                -against-                     **(Trial by Jury Demanded)**

**MICHEL JOSEPH MARTELLY, JOCELERME**

**PRIVERT, JOVENEL MOISE, THE WESTERN**

**UNION COMPANY,** d/b/a Western Union Holdings, Inc,

Western Union Financial Services, Inc., and through

other subsidiaries and affiliates**,**

**CARIBBEAN AIR MAIL, INC.,** d/b/a **CAM,**

**UNIBANK, S.A, UNITRANSFER USA, INC.,**

**UNIGESTION HOLDING, S.A.,** d/b/a **DIGICEL**

**HAITI, NATCOM S.A.,**

and **THE GOVERNMENT OF HAITI,**

                         Defendants.

_____

## SECOND AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY

## TRIAL

Plaintiffs, Odilon S. Celestin, Widmir Romelien, Marie Lucie St Vil, Gorettie St Vil, Jeannette Valeus, Guetty Felin, Herve Cohen (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, upon personal knowledge and upon information and belief as to other matters, allege as follows:

## <u>NATURE OF THE CLAIMS</u>

1. Plaintiffs bring this action against the Defendants for entering into a horizontal price fixing agreement in violation of Section 1 of the Sherman Act of 1890 as amended by the Clayton Act, The New York Donnelly Act, New York General Business Law § 349 and § 359, New York Banking Law § 131,  The California Cartwright Act, California Business & Professions Code§ 17500 et seq., California Business & Professions Code§ 17200 et seq., California Consumers Legal Remedies Act- Cal. Civ. Code §1750 et seq., Florida Deceptive and Unfair Trade Practices Act § 501.201 et seq., and the Communication Act 47 U.S. C.§ 151 et *seq*.

2. Whenever any reference is made in this Complaint to any representation, act or transaction of Defendants, or any agent, employees or representatives thereof, such allegations shall be deemed to mean that such principals, officers, directors, employees, agents or representatives of Defendants, while acting within the scope of their actual or apparent authority, whether they were acting on their own behalf or for their own benefit, did or authorized such representations, acts or transactions on behalf of Defendants, respectively.

3. Defendants, through well-coordinated efforts, combined and conspired to create a scheme to fix prices on money transfer services directed solely at the citizens and residents of certain countries in the Americas, primarily the United States of America.

4. In addition to the scheme to fix prices on money transfer services, Defendants also coordinated, combined and conspired to fix prices on international calls placed to Haiti. As per the Defendants, the intended victims of the two schemes were the people of the United States and Europe.

5. The Defendants misled and deceived unsuspecting consumers, including the named Plaintiffs and other Class Members, by promoting, marketing, and advertising the additional fees charged for money transfer as a tax imposition by the government of Haiti necessary to fund free education in Haiti. Plaintiffs are forced to pay higher prices at the time they remit funds to their relatives and friends. The horizontal price-fixing agreements further harmed the Plaintiffs as they paid more and received less talk time on phone calls placed to and from Haiti to apprise their relatives and friends of the money transfer effectuated.

## **JURISDICTION AND VENUE**

6. This Court has original subject-matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C.§ 1332 (d), which explicitly provides for the original jurisdiction of the federal courts in any class action in which at least 100 members are in the proposed plaintiff class, any member of the plaintiff class is a citizen

of a State different from the State of citizen of any defendant, and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs.

7. This Court may exercise personal jurisdiction over all of the Defendants because all of the Defendants currently transact business in the State of New York. Specifically, the Defendants market and sell their services in interstate commerce to consumers nationwide, including in this District, through subsidiaries, agents, wholesalers and distributors. The acts complained of have and will continue to have substantial effects in this District.

8. This Court has jurisdiction over this action under Section 1 of the Sherman Act, 15 U.S.C. §§ 1 & 26, and under 28 U.S.C. §§ 1331 and 1337.

9. This Court has jurisdiction over Plaintiffs' claims because Defendants' conducts violate title 47 U.S.C. §§ 151 *et seq*.

10. This Court has jurisdiction over Plaintiffs' claims under the Alien Tort Statute, 28 U.S.C. § 1350 because Defendants' conducts violate laws of the United States of America as well as the law of nations.

11. This Court has jurisdiction over the Defendants because their conducts fall within the general exceptions to the jurisdictional immunity of a foreign state under 28 U.S.C. §1605.

12. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiffs' claims based on the laws of the Republic of Haiti and over the state claims because those

claims are so related to the federal claims that they form part of the same case or controversy.

13.    Venue is proper in this District under 28 U.S.C.§ 1391 (b)(2). A substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, including Defendants' dissemination of false and misleading information regarding the nature and purpose of the funds collected.

14.    Each of the Defendants is found and transacts business within the Eastern District of New York.

## PARTIES

### Plaintiffs

15.    Plaintiff Widmir Romelien is a United States Citizen residing in Rego Park, Queens, New York.  For the past 15 years, he sent money to his family members and friends in Haiti through Western Union, CAM, or Unitransfer USA, Inc. which illegally collects an unlawfully raised US$1.50 on every money transfer he remits to Haiti.  Mr. Romelien used either Digicel or Natcom which illegally collects an unlawfully raised US$.05 more per minute on the call on behalf of the Haitian government whenever he calls his relative to communicate the money transfer control number (hereinafter "MTCN").

16.    Plaintiff Marie Lucie StVil is a United States Citizen residing in Brooklyn, New York. For the past 12 years, she has been sending money as well as making telephone calls to her family members who reside in Haiti. Ms. StVil is subjected to an illegal fee on money

sent and on telephone calls made during the last 8 years. Ms. StVil transacts mostly with Western Union, CAM, or Unitransfer USA, Inc. Ms. StVil used either Digicel or Natcom to communicate with family members and friends in Haiti.

17. Plaintiff Gorettie St Vil is a United States Citizen residing in Brooklyn, New York. For the past 20 years, she has been sending money as well as making telephone calls to her family members who reside in Haiti. Ms. St Vil is subjected to an illegal fee on money sent and on telephone calls made during the last 8 years. Ms. St Vil transacts business with either Western Union, CAM, or Unitransfer USA, Inc. Ms. St Vil used either Digicel or Natcom to communicate with family members and friends in Haiti. Additionally, Ms. St Vil also holds a bank account with Unibank S.A. and is subjected to the US$1.50 to deposit funds directly into her account from the United States using the services of Unitransfer USA, Inc.

18. Plaintiff Odilon S. Celestin is a United States Citizen residing in North Miami, Miami-Dade, Florida. For the past 17 years, he has been sending money as well as making telephone calls to his family who resides in Haiti. Mr. Celestin is subjected to an illegal fee on money and food sent togethert on telephone calls made during the last 8 years. Mr. Celestin transacts mostly with Western Union, CAM, or Unitransfer USA, Inc. Mr. Celestin would use either Digicel or Natcom to communicate with family members and friends.

19. Plaintiff Jeannette Valeus is a Haitian Citizen residing in North Miami, Miami-Dade, Florida. For the past 18 years, she has been sending money as well as making telephone

calls to her family who resides in Haiti. Ms. Valeus is subjected to an illegal fee on money and food sent together on telephone calls made during the last 7 years. Ms. Valeus transacts mostly with either Western Union, CAM, or Unitransfer USA, Inc. Ms. Valeus would use either Digicel or Natcom to communicate with family members and friends. Ms. Valeus uses mostly CAM, which forces her to pay the unlawfully raised $1.50 here in the United States as such an amount is allegedly already pre-programmed in CAM's transfer system.

20.   Plaintiff Guetty Felin is a United States Citizen residing in San Francisco, California. For the past 10 years, Plaintiff Felin has been sending money as well as making telephone calls to friends who reside in Haiti. Plaintiff Felin was subjected to an illegal fee on money sent and on telephone calls made during the last 9 years. Ms. Felin contracts mostly with Western Union and CAM. Whenever Ms. Felin contracts with Western Union or CAM, they illegally collect an unlawfully raised $1.50 more on behalf of the Haitian government.

21.   Plaintiff Herve Cohen is a United States Citizen residing in San Francisco, California. For the past 10 years, Mr. Cohen has been sending money as well as making telephone calls to friends who reside in Haiti. Mr. Cohen was subjected to an illegal fee on money sent and on telephone calls made during the last 9 years. Mr. Cohen contracts mostly with Western Union and CAM. Whenever Mr. Cohen contracts with Western Union or CAM, they illegally collect an unlawfully raised $1.50 more on behalf of the Haitian government.

## **DEFENDANTS**

22.    The corporations named below are made Defendants herein. Each is licensed to conduct business or transacts in New York and is incorporated in the state with its principal place of business as indicated below.

| **Name of Corporation** | **State of Incorporation** | **Principal Place of Business** |
| --- | --- | --- |
| Western Union | Delaware | Englewood, Colorado |
| Caribbean Air Mail, Inc | Florida | Miami, Florida |
| Unitransfer USA, Inc. | Delaware | Miramar, Florida |
| Unigestion Holding | Delaware | Miami, Florida |
| Unibank S.A. | Haiti | Port-au-Prince |
| NATCOM S.A. | Haiti | Port-au-Prince |

During all or part of the period of time covered by this complaint, each defendant was engaged in providing international and interstate money transfer service and/or international and interstate telecommunication services in Metropolitan New York.

23.    Michel Joseph Martelly, Jocelerme Privert, Jovenel Moise, the Government of Haiti, plus various persons, not made Defendants in this complaint, participated either as ring leaders and/or as co-conspirators in the violation alleged herein and performed acts and made statements in furtherance thereof.

## **TRADE AND COMMERCE**

## **MONEY TRANSFER OPERATORS**

24. Money Transfer Operators-Western Union, MoneyGram, CAM, and Unitransfer USA, Inc,-provide money remittance services both nationally and internationally. Such transactions, as pertain to CAM and Uitransfer, include food delivering services as well to overseas beneficiaries. Their combined annual service sales for the past year at issue exceed US$500 billion.

25. The Defendants Western Union, CAM, Unitransfer USA, Inc. provide all or a substantial percentage of money remittance services throughout Metropolitan New York, particularly in Brooklyn to Haiti and other countries.

26. The services provided by, Defendants Western Union, Caribbean Airmail, and Unitransfer are within the flow of interstate and foreign commerce or have a substantial effect on interstate and foreign commerce.

27. Unibank S.A. is a bank incorporated in Haiti. It is not licensed to conduct banking operations within the United States, however, it accepts deposits into customer accounts in New York and Florida through its subsidiary Unitransfer USA, Inc.

**TELECOMMUNICATION COMPANIES**

28. Defendants Unigestion Holding S.A., d/b/a/ Digicel-Haiti and Digicel USA, and Nat-com S.A., are "common carriers" as defined under title 47 of the U.S.C. § 151 *et seq*. and are telecommunication companies that provide telecommunication services for a fee·. Such services include selling top-ups (replenishment of phone minutes) via their various

CLASS ACTION SECOND AMENDED COMPLAINT
Celestin et al. vs. Martelly et al.
Case No. 18-cv-7340 (LDH) (PK)

respective representatives throughout the United States both online and at physical locations.

29.    The Defendants provide all or a substantial percentage of telecommunication services throughout Metropolitan New York, particularly to Haiti and other countries.

30.    Defendant Unigestion Holding S.A. maintains and controls telecommunications equipment and systems in the State of New York.

31.    Defendants Unigestion Holding S.A. and Natcom S.A. actions are within the flow of interstate and foreign commerce or have a substantial effect on interstate and foreign commerce.

32.    The acts and practices of Defendants Unigestion Holding S.A. and Natcom S.A. have had the purpose or effect, or the tendency or capacity, of unreasonably restraining competition and injuring competition by preventing competition for telecommunication services, identified herein, and have directly resulted in an increase in consumer prices for those services.

33.    By unreasonably and illegally restraining competition for the telecommunication services identified herein, Defendants Unigestion Holding S.A. and Natcom S.A. have deprived the Plaintiffs and Class Members of the benefits of competition that the federal and states antitrust laws are designed to promote, preserve and protect.

34.    As a direct and proximate result of the unlawful conduct alleged above, the Plaintiffs and Class Members were not and are not able to purchase the services identified herein at

prices determined by a market unhindered by the impact of Defendants' anticompetitive behavior.

35. As a direct and proximate cause of the unlawful conduct alleged above, the Plaintiffs and Class Members have sustained injury and are threatened with continuing injury to their business and property unless Defendants are enjoined from continuing their unlawful conduct.

36. Plaintiffs and Class Members do not have an adequate remedy at law.

37. All conditions precedent necessary to the filing of this action have been fulfilled, waived or excused.

## <u>CLASS ALLEGATIONS</u>

38. Plaintiffs incorporate all above allegations by reference as though fully set forth herein.

39. Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure on behalf of a nationwide class (the "Nationwide (b)(2) Class"), defined as:

> All persons in the United States and its territories who used the services of one or more of the Money Transfer Operators and Telecommunication Companies during the Class Period who were subjected to paying the $1.50 on money and food transfers made to and from Haiti and $0.05 per minute on phone calls placed to and from Haiti.

40.     In addition, Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Rule 23(a) and (b)(3) on behalf of a nationwide class (the "Nationwide (b)(3) Class"), defined as being coextensive with the Nationwide (b)(2) Class.[1]

41.     Alternatively, Plaintiffs bring this action pursuant to Rule 23(a) and (b)(2) on behalf of themselves and a multi-state class of New York, Florida, and California residents (the "NY- FL-CA (b)(2) Class"), defined as:

> All persons in New York, Florida, and California who used one or more of the Money Transfer Operators and Telecommunication Companies during the Class Period.

and, pursuant to Rule 23(a) and (b)(3), on behalf of a multi-state class of New York, Florida, and California residents (the "NY-FL-CA (b)(3) Class"), defined as being coextensive with the NY-FL-CA (b)(2) Class.[2]

42.     Alternatively, Plaintiffs bring this action on behalf of themselves and on behalf of several statewide classes, as follows:

> a. Pursuant to Rule 23(a) and (b)(2), Plaintiffs Widmir Romelien, Marie Lucie St Vil, and Gorettie St Vil bring this action on behalf of themselves and a class of New York residents who paid for the Services during the Class Period (the "New York (b)(2) Class") and, pursuant to Rule 23(a) and (b)(3), on behalf of a class of New York

---

1.     This Complaint refers to the Nationwide (b)(2) Class and the Nationwide (b)(3) Class, together, as the "Nationwide Classes."

2.     This Complaint refers to the NY-FL-CA (b)(2) Class and the NY-FL-CA (b)(3) Class, together, as the "NY-FL-CA Classes."

residents (the "New York (b)(3) Class"), defined as being coextensive with the New York (b)(2) Class.[3]

    b.   Pursuant to Rule 23(a) and (b)(2), Plaintiff Odilon Celestin brings this action on behalf of himself and a class of Florida residents who paid for the Services during the Class Period (the "Florida (b)(2) Class") and, pursuant to Rule 23(a) and (b)(3), on behalf of a class of Florida residents (the "Florida (b)(3) Class"), defined as being coextensive with the Florida (b)(2) Class.[4]

    c.   Pursuant to Rule 23(a) and (b)(2), Plaintiffs Guetty Felin and Herve Cohen bring this action on behalf of himself and a class of California residents who paid for the Services during the Class Period (the "California (b)(2) Class") and, pursuant to Rule 23(a) and (b)(3), on behalf of a class of California residents (the "California (b)(3) Class"), defined as being coextensive with the California (b)(2) Class.[5]

43.    Excluded from the Classes are Defendants, their subsidiaries, affiliates, and employees; all persons who make a timely election to be excluded from the Classes; governmental

---

3.    This Complaint refers to the New York (b)(2) Class and the New York (b)(3) Class, together, as the "New York Classes."

4.    This Complaint refers to the Florida (b)(2) Class and the Florida (b)(3) Class, together, as the "Florida Classes."

5.    This Complaint refers to the California (b)(2) Class and the California (b)(3) Class, together, as the "California Classes."

entities; and the judge(s) to whom this case is assigned and any immediate family members thereof.

44. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

## Numerosity-Federal Rule of Civil Procedure 23(a)(1)

45. The members of each of the Classes are so numerous that individual joinder of all class members is impracticable.

46. The precise number of members of the Classes is unknown to Plaintiffs, but it is clear that the number greatly exceeds the number that would make joinder practicable, particularly given Defendants' worldwide service network.

47. Members of the Classes may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

## Commonality and Predominance-Federal Rule of Civil Procedure 23(a)(2) and (b)(3)

48. This action involves common questions of law or fact, which predominate over any questions affecting individual members of the Classes. All members of the Classes were exposed to Defendants' deceptive and misleading advertising and marketing claims that the fees were taxes imposed to fund free education because those claims were made

through radios, newspapers and televisions where the Plaintiffs reside. Furthermore, common questions of law or fact include:

    a.   whether Defendants engaged in the conduct as alleged herein;

    b.   whether Defendants' practices violate applicable law cited herein;

    c.   whether Plaintiffs and the other members of the Classes are entitled to actual, statutory, or other forms of damages, and other monetary relief; and

    d.   whether Plaintiffs and the other members of the Classes are entitled to equitable relief, including but not limited to injunctive relief and restitution.

49.    Defendants engaged in a common course of conduct in contravention of the laws Plaintiffs seek to enforce individually and on behalf of the other members of the Classes. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. Moreover, the common questions will yield common answers.

### **Typicality-Federal Rule of Civil Procedure 23(a)(3)**

50.    Plaintiffs' claims are typical of the claims of the other members of the Classes because, among other things, all members of the Classes were comparably injured through the uniform misconduct described above, were subject to Defendants' false, deceptive, misleading, and unfair advertising and marketing practices and representations, including the false claims that "the fees were imposed by lawful tax laws." Further, there are no defenses available to Defendants that are unique to Plaintiffs.

## Adequacy of Representation-Federal Rule of Civil Procedure 23(a)(4)

51.     Plaintiffs are adequate representatives of the members of the Classes because their interests do not conflict with the interests of the other members of the Classes they seek to represent; they have retained counsel competent and experienced in complex litigation together with knowledge of French and Haitian laws; and Plaintiffs will prosecute this action vigorously. The Classes' interests will be fairly and adequately protected by Plaintiffs and their counsel. The Law Offices of Denis Law Group, PLLC and Rodney R. Austin PLLC. have long been leaders in the representation of consumers in a wide variety of actions where they have sought to protect consumers from fraudulent and deceptive practices.

## Declaratory and Injunctive Relief-Federal Rule of Civil Procedure 23(b)(2)

52.     Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the members of the Nationwide Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Classes as a whole. The conducts complained of by the Plaintiffs are violations per se of the Sherman Act and the antitrust laws of the states of New York, Florida and California.

## FACTS SUPPORTING THE CLAIMS

53.     Defendant Martelly admitted that he entered into price fixing agreements on money transfer and telecommunication services before he took office as President.

54. Defendant Martelly statements reveal that the Defendants conspired to fix prices on money transfer and telecommunication services before he took office as president.

55. According to Defendant Martelly, even though the price fixing agreements were a "fait accompli", the Co-conspirators wanted to start collecting the increased amount right away, he needed to wait until he took office to put in place the scheme's mechanism.

56. The scheme's mechanism put in place by Defendant Martelly was a Presidential Order and two circulars issued by the Central Bank known as Banque de la Republique D'Haiti (hereinafter "BRH").

57. Both acts ran afoul of the laws of Haiti[6].

58. Upon information and belief, such measures were allegedly put in place as means to raise funds to provide free education to the poor street children of Haiti who could not afford to go to school. The measures mentioned are presented and sold to the public as "taxes levy to finance education."

59. The Presidential Order, published on Wednesday, September 14, 2011 under publication number 129 of the official newspaper "Le Moniteur" contains only four articles.

60. Pursuant to Article 1 of the Presidential Order, "the floor price for all incoming international call is hence forth fixed at US$0.23 per minute."

---

[6] Under Haiti's jurisprudence, only the parliament may raise taxes and fees for the benefit of the state.

CLASS ACTION SECOND AMENDED COMPLAINT
Celestin et al. vs. Martelly et al.
Case No. 18-cv-7340 (LDH) (PK)

61.     According to Article 2 of said order, US$0.05 out of the US$0.23 are to be turned over to the Government of Haiti by the phone operators through its telecommunication regulatory branch CONATEL.

62.     According to Article 3, the purpose for the collection of the US$0.05 is to help the government agency CONATEL fight against telephone fraud.

63.     The Presidential Order is the instrumentality that Defendant Martelly and the telecommunication companies use to justify their price fixing agreement.

64.     Despite the clear and concise language of the Presidential Order, Defendants nevertheless present, promote, market, and advertise the raised price as a "tax."

65.     In addition to the Presidential Order, Defendant Martelly, through BRH, issued two circulars, number 98 and 7 which memorialized the agreement to fix prices on money transfers effectuated to Haiti from the United States and elsewhere.

66.     Circular 98, which was issued on May 20, 2011, states that a "testing, certification, user and inspection fees in the amount of US$1.50 will apply on every transaction for payment services and access at various points throughout the country.

67.     Circular 98 obligates the money transfer operators to file with BRH weekly and "monthly certified copies of reports detailing the total amounts filed with the regulatory body of the territories where they are licensed to operate as Money Transfer Operators."

68.    Citizens and residents of the United States also send food through Caribbean Airmail, Inc. (hereinafter "CAM") and Unitransfer USA, Inc, therefore circular 98 obligates the collection of the US$1.50 on food remittances as well.[7]

69.    After the drafting and publication of circular 98, the Defendants realized that their agreement was missing an important term and that is: **WHERE DO WE COLLECT THE US$1.50?**

70.    Because of the missing term, the Defendants reconvened on Friday May 27, 2011 and Tuesday May 31, 2011 to amend circular 98 to include: "[t]he fees will be collected at the source from all money transfer sent and received (cash or in kind) from overseas.

71.    Circular #7 also established the geographical zones for the collection of the US$1.50. Per the circular, the US$1.50 is to be collected only from the people of the United States, Canada, Turks and Caicos, and the Bahamas.

72.    Upon information and belief, the intent and purpose behind the Presidential Order and Circulars is to discriminate against people from particular geographical zones by charging them additional fees on money transfers as well as phone calls to and from Haiti under the guise of a lawful tax imposition.

---

[7] 1.    **Reporting of International Transfers**: All commercial banks, saving and mortgage banks, and transfer agencies must file paper report with BRH every Monday detailing the total number of transfers effectuated to and from Haiti, irrespective of how the beneficiary receives such transfer (in kind or cash), in keeping with the attached reporting form. The reason given for collecting the illegally raised US$1.50 by Circular 98 is negated by the fact that the US$1.50 are also collected on food remittances.

73. Upon information and belief, after Defendants conspired and finalized their arranged agreement, they embarked on a campaign to publish, advertise, market , and promote through spoken words and/or conducts the additional fees as "tax levy to fund free and compulsory education."

74. This anticompetitive conduct-schemes to fix and maintain prices, and otherwise thwart competition-has caused a significant, lasting and ultimately harmful rippling effect in communities in the United States who must remit money, food, and place phone calls to Haiti, which is still ongoing to date.

75. The schemes were conceived and directed by high ranking officials of the government of Haiti together with executives at the highest levels of the Defendants' companies.

## UNGESTION HOLDING-DIGICEL HAITI and NATCOM S.A.' S ROLES

76. Mr. O'Brien, CEO of Unigestion Holding praised the schemes to collect US $1.50 and US $.05 in declaring to the New York Times that even though he "knew the charges would be unpopular with consumers, he regarded them as an innovative means of raising needed revenue and a promising sign of government resolve."

77. According to the New York Times, "Mr. O'Brien spoke enthusiastically about plans by Haiti's president, Michel Martelly, to finance his program to provide free primary school education to all Haitian children with fees on cellphone calls and remittances."

78. The New York Times refers to the added charges as "fees," but Mr. O'Brien refers to them as "taxes."

79.     According to the admissions by Mr. O'Brien and Defendant Martelly, the illegal
        agreements were made prior to Defendant Martelly being sworn in as President.  Martelly
        stated that when he called the Defendants to ask them to increase the price of phone calls
        and money transfers they all agreed instantly.

80.      Upon information and belief, Unigestion Holding through its owner or high-level
        executives participated in the drafting of the President Order justifying the price increase
        on phone calls which were published on September 2011.

81.     The telecommunication companies together with Defendant Martelly knew the
        imposition of the surcharge/tax, however they termed it, was unlawful and a hindrance to
        competition, not to mention an opportunity to enrich a certain group of people.

82.     The Presidential Order was published on September 2011 and "two months later, it was
        discovered that US$26 million in the new National Fund for Education was missing."

83.     According to Mr. O'Brien, he spoke to Defendant Martelly about the disappearance of
        the US$26 million and promised an audit. Mr. O'Brien promised to "make it [his]
        business to have an audit one way or the other."

84.     Despite knowledge that the funds were being funneled for purposes other than what was
        advertised to the public, Unigestion Holding S.A. and Natcom S.A. continues to turn over
        collected funds to the Haitian Government without at least offering the public a periodic
        account of moneys turned over to the government of Haiti.

85.     Upon information and belief, Unigestion Holding S.A. and Natcom S.A. benefited and continue to profit from the added illegally raised US$0.05 charged per minute on calls place to Haiti.

86.     Upon information and belief, to maintain their illegal gains secret, Unigestion Holding and Natcom S.A. do not publish a report to the public detailing the amount of monies collected and turned over to the government of Haiti from June 2011 to date.

87.     According to both telecommunication companies, Unigestion Holding S.A. and NATCOM S.A., they have collected the funds at issue and turned them over "to the Haitian government as taxes pursuant to Haitian tax law."

88.     Both telecommunication companies, since they played integral roles in the conspiracy to fix the price on phone calls, are fully aware that the alleged tax law referred to is the Presidential Order which is not law.

89.     Unigestion Holding and NATCOM, acting for their own account and on behalf of government of Haiti, discriminated and continue to discriminate against the people of the United States by adding an illegally raised US$0.05 per minute for calls made to Haiti.

90.     Upon information and belief, Unigestion Holding and NATCOM are common carriers with distributors and agents selling "Top-up (phone minutes)," and phone cards to citizens and residents throughout the United States, including New York.

91.     Upon information and belief, Unigestion Holding and NATCOM are common carriers as defined under title 47 of the USC § 151 *et seq.*

CLASS ACTION SECOND AMENDED COMPLAINT
Celestin et al. vs. Martelly et al.
Case No. 18-cv-7340 (LDH) (PK)

92.     Upon information and belief, Unigestion Holding and NATCOM know or should have known that as common carriers, they cannot engage in discriminatory practice resulting in higher prices to certain group of consumers.

93.     In an article published by haitilibre, an online newspaper, former Deputy Director General of NATCOM, Yves Armand declared that… Meetings with the CONATEL have took [sic] place even before [Martelly] being sworn in, about these new rates, while the new government was not in place, the law on the establishment of this tax is not yet passed and the project has no legal framework currently.

94.     Mr. Armand went further to say, " [w]e are for the FNE, for the introduction of a fee of US$0.05 per minute on international incoming calls, but we are against price floors […] we are for free competition, against price fixing. For 13 years, telecommunications companies exist, this was never done. Why introduce it now?

95.     Upon information and belief, despite having knowledge of the price fixing scheme, Unigestion Holding and NATCOM agreed to charge an additional US$0.05 per minute to citizens and residents of the United States.

96.     Upon information and belief,  Unigestion Holding and NATCOM charge the illegally raised US$0.05  while representing it as a tax designed to fund free education.

97.     Unigestion Holding and NATCOM's acts and conducts are deliberate and are done with the sole intent and purpose to deceive consumers in the United States.

98.     Unigestion Holding and NATCOM, through their omission and/or overt acts and conducts, intended to and did mislead the public into thinking that the fixed US$0.05 was a lawful tax aimed at funding free and compulsory education in Haiti.

**MONEY TRANSFER OPERATORS**

**WESTERN UNION**

99.     Western Union, CAM, and Unitransfer USA, Inc, through their respective senior leadership and top executives, fostered and promoted the fraudulent collection of the unlawfully raised US$1.50 fee as "taxes" from citizens and residents of the United States.

100.    Upon information and belief, Western Union, CAM, Unitransfer USA and all other parties involved designed a scheme to facilitate the collection of the unlawful raised US$1.50.

101.    The scheme calls for the money transfer operators to add the unlawfully raised US$1.50 to the total amount being remitted.

102.    Once consumers complete a money transfer transaction with Western Union, their final receipt shows that the unlawfully raised US$1.50 is removed from the overall amount being remitted, which is paid here in the US, and is either itemized as "BRH fee" or just listed as "fee."

103.    Western Union charges the unlawfully raised US$1.50 to consumers in the United States and elsewhere as a fee for using the BRH's allegedly new platform.

104.     The public at large does not conduct business with BRH, the money transfer operators do.

105.     Circular 7 claims the illegally raised US$1.50 is charged allegedly as "usage and user fees of the BRH's payment platform" to citizens and residents of the United States, Canada, Turks and Caicos, and the Bahamas.

106.     The fees charged are allegedly for "testing, certification, usage, and inspection."

107.     Upon information and belief, Western Union, CAM, and Unitransfer USA, Inc. knew that adding such a fee onto the fees they charge to transfer money to and from Haiti would result in a violation of the Sherman Act and the antitrust laws of the states where they operate, including New York, Florida, California, and other states.

108.     Upon information and belief, Western Union is aware that the fees are published, advertised, and promoted to people around in the United States and Haiti as "taxes levy to fund free education."

109.     Upon information and belief, Western Union is fully aware of the fact that consumers sending money to Haiti from the United States are unaware of the reason behind the illegally raised US$1.50 fee; hence, their agents falsely tell consumers that the fee is a tax levied by the Haitian government to fund free education.

110.     Upon information and belief, while Western Union failed to disclose to its consumers the reason behind the illegally raised US$1.50, it instructs its agents throughout the United States to actively require consumers to pay the illegally added fee.

111. Western Union, in an attempt to justify its participation in the scheme, responding to Plaintiffs counsels' demand letter, asserted that "Western Union's local agents in Haiti are obligated to comply with the BRH Circulars, which carry the force of law. In order to facilitate the payments to the BRH, Western Union's agents in Haiti deduct the Fee from all money transfers sent from the United States to Haiti, after the fee and the associated deduction is conspicuously disclosed to senders."

112. Western Union is contradicted by Western Union's own receipts which show that the unlawfully raised US$1.50 is collected in the United States by its agents.

113. Western Union maintains that "Circular No. 7 (May 31, 2011) clarified that the fee is to be collected on transfers received from or sent abroad."

114. Circular No. 7 limits the collection of said illegally raised US$1.50 charge to citizens and residents of the United States, Canada, Turks and Caicos, and the Bahamas.

115. Western Union offers its consumers a pre-receipt that they must sign. Between the amount sent and all deductions lies terms printed in small prints that consumers simply sign without reading the content thereof.  It inserts a line right below the amount to be paid that reads: "**For all transfers, Receivers may receive less due to foreign taxes**."

116. Upon information and belief, Western Union retains a portion of the illegally raised US$1.50 as payment for its participation in the scheme.

117.    Western Union, just like CAM and Unitransfer USA, Inc., has not made public any report detailing the amount collected and turned over to the government of Haiti from the inception of the scheme to date.

118.    In the aggregate, Western Union's deceptive acts and conducts amount to fraud.

119.    Western Union, through its actions or inactions, omission and/or overt acts and conducts intended to and did mislead the public into thinking that the fixed US$1.50 was a lawful tax aimed at funding free and compulsory education in Haiti when they knew it was not the case.

## CARIBBEAN AIRMAIL, INC -CAM

120.    CAM, either through its owners and/or high-level executives, like the other money transfer operators met with the other Defendants and conferred on Friday, May 27, 2011 and Tuesday, May 31, 2011 to further collude on a price fixing agreement.

121.    Upon information and belief, the parties agreed to illegally raise the transfer fee by US$1.50.

122.    CAM applies the same modus operandi as Western Union and Unitransfer USA, Inc. by adding the illegally raised US$1.50 charge to the overall amount being sent by the senders.

123.    Upon information and belief, CAM knew that adding such a fee in addition to the fees they charge to transfer money to and from Haiti would result in a violation of the

Sherman Act and the antitrust laws of the states where they operate, including New York, Florida, California, and other states.

124. Upon information and belief, CAM is aware that the fees are published, advertised, and promoted to consumers as taxes levy to fund free education without ever correcting this false and misleading information.

125. CAM's receipt shows that the amount to be paid out excludes the US$1.50 which is included in the overall amount collected from the sender.

126. CAM does not show nor offer a description for the illegally raised US$1.50 collected either on money or food transfers. The US$1.50 is included in the money sent.

127. CAM does not offer consumers the choice of adding the illegally raised US$1.50 to the total amount being remitted or deducted from the total amount of money or cost of the food being transferred.

128. Upon information and belief, CAM simply programs its computer system to include the $1.50 in the overall amount being remitted or paid for the food transfer.[8]

129. CAM collects the illegally raised US$1.50 charge from money transfers effectuated to and from Haiti worldwide even though Circular 7 directed them to collect the illegal

---

[8] CAM and Unitransfer added food transfer to their services to allow senders who wish to send food as opposed to money to their relatives. Senders would go to either CAM or Unitransfer and place an order to send bags of rice or corn, beans, gallons of cooking oil, etc. to their relatives or friends. CAM and Unitransfer, in turn, would then contact their warehouse in Haiti and ask that the items purchased by the senders be delivered to intended beneficiaries.

fixed charge from consumers residing in the United States, Canada, Turks and Caicos, and the Bahamas.

130.    CAM, does not inform its consumers of the true nature of the added charges, and acting in conformity with the anticompetitive agreement, inserts a line on its receipts right below the amount to be paid that reads: "**Recipient may receive less due to fees by the recipient's bank and foreign taxes**."

131.    Upon information and belief, CAM derives a benefit from the scheme by retaining a portion of the illegally raised US$1.50 it charges consumers to send money to Haiti.

132.    CAM has not made public any report detailing the amount of funds collected and turned over to the Haitian government from the inception of the scheme to now.

133.    CAM issues two different type of receipts depending on your geographical location.

134.    Florida residents sending money to Haiti receive a receipt issued on 8x11 paper.  New York residents receive a receipt that is 3 inches wide and 12 inches long but contains no terms and is not itemized.

135.    CAM's actions are fraudulent and are designed to keep consumers in the dark regarding the true nature of the raised US$1.50 while CAM collects them on both money and food transfers.

136. CAM, through its actions or inactions, omission and/or overt acts and conducts, intended to and did mislead consumers in the United States into thinking that the illegally raised US$1.50 was a lawful tax aimed at funding free and compulsory education in Haiti.

**UNITRANSFER USA, INC.**

137. On Friday, May 27, 2011 and Tuesday, May 31, 2011, Unitransfer USA, Inc, through its owners and/or high levels executive, met and conferred with BRH, Western Union, CAM, and Unibank S.A. to further collude on a price fixing agreement.

138. Unitransfer USA, Inc, in keeping with the illegal arrangement, adds the illegally raised fee of US$1.50 to the amount being sent by the remitters in the United States to Haiti.

139. Upon information and belief, Unitransfer USA, Inc. knew that adding the US$1.50 onto the fee being charged to transfer money to and from Haiti would result in violating the Sherman Act and the antitrust laws of the states where they operate, including New York, Florida, California, and other states.

140. The receipts issued by Unitransfer USA, Inc. shows that the amount remitted minus the unlawfully raised US$1.50 is deducted as Fee or BHR fee. The fee is collected here from United States citizens and residents sending money to Haiti.

141. Upon information and belief, Unitransfer USA, Inc. published, advertised, and promoted to consumers that the $1.50 is collected as "taxes levy to fund free education."

142. Unitransfer USA, Inc. offers two different type of receipts, one for consumers living in New York, and a different type to consumers living in Florida. The receipts issued in

New York show where the illegally raised US$1.50 is deducted. The receipts issued in Florida does not itemize the US$1.50 deduction.

143. Upon information and belief, consumers using Unitransfer USA, Inc. have never received a receipt itemizing the illegally raised US$1.50.

144. Unitransfer USA, Inc., does not give consumers the option to add the illegally raised US$1.50 in the United States; it is taken anyway from the total sum remitted whether added or not.

145. Unitransfer USA, Inc, instead of informing consumers of the true nature of the added charges inserts a line in its receipts that reads: "**Recipient may receive less due to fees by the recipient's bank and foreign taxes**."

146. Upon information and belief, a percentage of the illegally raised US$1.50 is retained by Unitransfer USA, Inc. for their participation in this scam.

147. Unitransfer USA, Inc. has not made public any report detailing the amount of funds collected form the illegally raised US$1.50 and turned over to the Haitian government from the inception of the scheme to now.

148. In the aggregate, Unitransfer's action or inaction, omission, covert and/or overt acts, deceptive acts and conducts amount to fraud.

149. Unitransfer USA, Inc, through its action or inaction, omission and/or overt acts and conducts, adopted the statement that the fees are taxes with the sole intent and purpose to deceive the consuming public.

150. As a result of the acts, conducts, action or inaction and/or omission, performed by Unitransfer USA, Inc., CAM, and Western Union, consumers were misled into believing that the illegally raised US$1.50 was a lawful tax aimed at funding free and compulsory education in Haiti.

## UNIBANK S.A.'S ROLE

151. Unibank S.A. is a bank licensed and incorporated under the laws of Haiti.

152. According to Unibank S.A.'s audit, published on January 2018, Unibank is the parent company and a 100% owner of the following banking, non-banking, and real estate companies: Unitransfer S.A. (Haiti), Unitransfer International LTD, GFN International Assets LTD, GFN Real Estate LTD, GFN Real Estate LLC, GFN Restaurant II LLC and a host of other companies not here listed.

153. Unibank S.A. exercises "significant influence" if it controls between 20% to 50% of the voting rights of an entity, according to its 2018 audit.

154. Uninbank S.A. is purported the sole member of GFN which in turn allegedly wholly owns Unitransfer USA, Inc.

155. Unibank S.A. owns and control Unitransfer USA, Inc., their related entities and their coordinated conduct is to be treated as the unitary conduct of a single enterprise which together they form.

156. Unibank's high level executives also participated in the price fixing meeting that took place on Friday, May 27, 2011 and Tuesday, May 31, 2011.

157.   Unibank S.A., "[i]n Haiti as well as in foreign countries, [], directly or through its []
subsidiaries, offers banking and financial services to its individual, commercial and
institutional clients, using its national and international networks."

158.   Unibank S.A., is not licensed to conduct banking activities of any sort including deposits
anywhere in the United States.

159.   Upon information and belief, Unibank promised consumers in the United States the
ability to make direct deposit into their Unibank accounts free of charge using Unitransfer
USA, Inc., its agent.

160.   Unibank customers who make deposits into their Unibank accounts through Unitransfer
USA, Inc. as the depository, are subjected to the illegally raised US$1.50.

161.   Upon information and belief Unibank account deposits are made in New York, Florida
and other states where they operate.

162.   Upon information and belief, Unitransfer USA, Inc. and Unibank S.A. share computer
system to facilitate direct deposits into the accounts of consumers living in the United
States who maintain accounts with Unibank S.A.

163.   Upon information and belief, both Unitransfer USA, Inc. and Unibank, Inc. are profiting
from the illegally raised US$1.50 as payment for participation in the scheme.

164. Upon information and belief, Unibank, through its subsidiary Unitransfer USA, Inc., plays a major role in the theft of the proceeds from the illegally raised US$1.50 collected from citizens and residents of the United States.

165. Upon information and belief,  Unibank S.A. in assisting Defendant Martelly to embezzle the proceeds from the illegally raised US$1.50 extended Martelly a US$9,000,000.00 loan to build a beach house.

166. Upon information and belief, the US$9,000,000.00 loan is nothing but payment to Defendant Martelly from the proceeds of the illegally raised US$1.50 charged to Uinted States citizens and residents.

167. Unibank S.A., and its subsidiary Unitransfer USA, Inc., has not made public any report detailing the amount collected and turned over to the government of Haiti from the inception of the scheme to date.

168. Unibank's deceptive acts and conducts in the aggregate amount to fraud.

169. Unibank, through its action or inaction, omission, covert and/or overt acts and conducts intended to and did mislead the public into thinking that the fixed US$1.50 was a lawful tax aimed at funding free and compulsory education in Haiti.

## DEFENDANTS MARTELLY, PRIVERT, and MOISE

170. The principal architect and ringleader of the conspiracies identified herein is Defendant Martelly. With the assistance of associates and high-ranking officials of the Haitian Government, Defendant Martelly organized and initiated a wide-ranging scheme which

included numerous telecommunication companies and money transfer operators, all of whom were knowing and willing participants. Collectively, Defendants were able to obtain a substantial windfall as a result of these illegal agreements.

171. Defendant Martelly admitted that prior to taking the presidential oath, he contacted the telephone companies and asked them to add US$0.05 per minute on all phone calls coming from the United States and Europe and they agreed almost immediately.

172. Defendant Martelly admitted that with the raised US$0.05 per minute on every phone call to Haiti, the government would generate US$3,500,000.00 per month.

173. Defendant Martelly and Unigestion Holding admitted that the raised US$0.05 per minute would generate yearly a total of "between US$35-40,000,000.00" per year.

174. Upon information and belief, after finalizing the price fixing agreement with the telecommunication companies, Defendant Martelly met with the money transfer operators, Western Union, MoneyGram, CAM, Unitransfer USA, Inc, Unibank S.A. together with all other commercial banks to strike an anticompetitive agreement that would illegally raise the fee to remit money to Haiti by US$1.50.

175. MoneyGram decided not to participate in the scheme.

176. Defendant Martelly admitted that he wanted the money transfer operators to contribute US$1.00 from every money transfer effectuated to Haiti to fund his alleged PSUGO.

177.   Defendant Martelly admitted that with the US$1.00 contribution from every money transfer to Haiti the government would generate a total of US$5,000,000.00 per month, amounting in the aggregate to a yearly revenue of US$60,000,000.00.

178.   Upon information and belief, Defendant Martelly met with the money transfer operators and together they agreed to pass on the new charge to the citizens and residents of the United States and three other countries. The charges increased from US$1.00 to US$1.50.

179.   With the newly added US$0.50, the government, as opposed to generating only US$5,000,000.00 per month, now generates a total of US$7,500,000.00 monthly, amounting to a yearly revenue of US$90,000,000.00.

180.   Adding the US$42,000,000.00 from the illegally raised of US$0.05 per minute on international calls to the US$90,000,000.00 from the illegally raised US$1.50, the government of Haiti receives at least an estimated US$132,000,000.00 per year for the alleged PSUGO.

181.   In order to facilitate such large collection of revenues, Defendant Martelly together with the other Defendants colluded to draft and Martelly issued a Presidential Order and two Circulars.

182.   The Presidential Order, which calls for the added US$0.05 per minute on phone calls does not mention funding of education for Haitian children.

183.   The Circulars (#98 and #7), the basis for the US$1.50 additional charge on money remittances, also make no mention of funding education.

CLASS ACTION SECOND AMENDED COMPLAINT
Celestin et al. vs. Martelly et al.
Case No. 18-cv-7340 (LDH) (PK)

184.   Defendant Martelly knew that neither his Presidential Order nor his circulars contain language relating to tax or funding education, he nevertheless promoted, marketed, advertised, and sold the newly added charges as "taxes imposed to finance free education."

185.   Upon information and belief, Defendant Martelly travelled to the United States and falsely claimed that the added charges were a necessary tax needed to finance free and universal education for the street children who could not afford to go to school.

186.   Defendant Martelly admitted that prior to taking his presidential oath, he needed to provide free schooling for a total of 500,000 street children, after taking office he "realized that there was enough money to school all 900,000 students.

187.   Defendant Martelly further admitted that the government did not need the money being generated by the Presidential Order and Circulars. Defendant Martelly stated that "we will continue to collect it and use it for other things."

188.   Despite his admissions that the government had enough money to school children, Martelly intentionally and wantonly advertised, promoted, marketed, and sold the new added fees as "lawful tax imposition."   Its sole intent and purpose was to defraud the citizens and residents of the United States.

189.   Defendant Martelly's deceptive acts and conducts in the aggregate amount to fraud.

190.     Defendant Martelly, through his omission, overt acts, and conducts, intended to and did mislead the public into thinking that the illegally raised US$0.05 and US$1.50 were lawful taxes aimed at funding free and compulsory education in Haiti.

## DEFENDANT PRIVERT

191.      Upon information and belief, Defendant Privert was the Haitian senate leader at the time Defendant Martelly instituted his fraud scheme.

192.     Upon information and belief, Defendant Privert was among the voices that vehemently opposed Defendant Martelly's fraud scheme by claiming that Defendant Martelly does not have legal authority under the constitution to enact such acts.

193.     Defendant Privert became president after Defendant Martelly's 5 years term ended.

194.     Defendant Privert, despite knowing that the proceeds from the illegally raised US$0.05 and US$1.50 were ill-gotten gains that were not being used to fund education, continued with their collection.

195.     According to Defendant Martelly, Defendant Privert, who opposed the unlawfully raised fees because of their illegality when he was a member of the parliament, now enjoys the collection thereof.

196.     According to Defendant Martelly, the PSUGO program was dissolved after he left office.

197.     Defendant Privert acquiesced and therefore, adopted as his own the acts and conducts of his predecessor Defendant Martelly as he profited from the scheme in the same manner as did his predecessor.

198. Defendant Privert, through his action or inaction, omission, covert and/or overt acts and conducts intended to and did mislead the public into thinking that the fixed US$0.05 and US$1.50 were lawful taxes aimed at funding free and compulsory education in Haiti.

**DEFENDANT MOISE**

199. Defendant Moise is the current occupant of the National Palace of Haiti.

200. Upon information and belief, Defendant Moise was selected to ensure that knowledge of the depletion of the education funds together with other public funds by his predecessors, Defendant Martelly and Defendant Privert, never come to light.

201. Defendant Moise admitted during a television interview that he knew very little or nothing about how the illegally raised US$0.05 and US$1.50 are spent.

202. Defendant Moise declares that the government of Haiti received only a total of US$117,000,000.00 for the eight years that the telecommunication companies and money transfer operators have been collecting the illegally raised US$0.05 and US$1.50.

203. According to Defendant Moise, the funds ill-gotten from the Plaintiffs and Class Members went to educate their brothers and sisters and have not been expropriated by anyone. There has been no proper accounting to the public as to the exact amount of money collected through the scheme or, more importantly, what the collected monies were used for.

204. Upon information and belief, Defendant Moise, and the Government of Haiti cannot give accurate account of the exact number of children in need of free education because such a program does not exist.

205. Defendants Martelly, Privert, and Moise knew that the PSUGO was a scam and a sham designed to defraud citizens and residents of the United States of America and elsewhere.

206. Defendant Moise acquiesced and therefore, adopted as his own the acts and conducts of his predecessors, Defendant Martelly and Privert, as he profited from the scheme in the same manner as did his predecessors.

207. Defendant Moise's deceptive acts and conducts in the aggregate amount to fraud.

208. Defendant Moise, through his action or inaction, omission covert and/or overt acts and conducts intended to and did mislead the public into thinking that the fixed US$0.05 and US$1.50 were lawful taxes aimed at funding free and compulsory education in Haiti.

## DEFENDANT GOVERNMENT OF HAITI

209. The Government of Haiti, through BRH and with the assistance of associates and high-ranking officials, organized and initiated a wide-ranging scheme which included numerous telecommunication companies and money transfer operators, all of whom were knowing and willing participants. Collectively, Defendants were able to obtain a substantial windfall as a result of these illegal agreements.

210. Upon information and belief, the Government of Haiti together with the other named Defendants targeted citizens and residents of the United States to defraud.

211. Upon information and belief, the scheme orchestrated with the complicity of the Government of Haiti has resulted to date in a loss of at least US$1 billion to the citizens and residents of the United States.

212. Defendant Martelly's declaration places the total sum collected to date at roughly US$1 billion; yet the Government of Haiti claims receipt of only US$120,000,000.00.

213. The press secretary for the Haitian government does not know the exact amount of money that the government receives on a monthly basis however, she alleges receipt of US$120,000,000.00 for the 8 years that the telecommunication companies and the money transfer operators have been in question.

214. There is a huge discrepancy between the amount of funds collected through the illegal scheme and what the Government of Haiti has said they have received.

215. Upon information and belief, the Government of Haiti together with all other named Defendants have conspired to conceal the true amount of funds collected and received over the years.

216. Upon information and belief, the concealment of the exact amount of funds collected and received through the scheme described herein is designed with the sole intent to further defraud the people of the United States and elsewhere.

217. Despite the discontinuation of the PSUGO, the Government of Haiti together with the other named Defendants elect to continue to charge and collect the illegally raised fee without providing "free and universal education."

218. The Government of Haiti's continued acts and practices have resulted in great economic harm to the people of the United States and elsewhere.

219. As a result of the conspiracies enumerated herein, consumers nationwide and internationally paid more to call Haiti as well as to send money and food to Haiti than they otherwise would have to in a competitive market, and the Defendants illegally profited as a result.

## CAUSES OF ACTION

### COUNT I
(Price Fixing)

220. Plaintiffs repeat and re-allege every preceding allegation as if fully set forth herein.

221. On or about April of 2011, Defendant Martelly devised a scheme to raise prices on telecommunication and money transfer services.

222. Defendant Martelly communicated directly with Defendants Unigestion Holding, NATCOM S.A., Western Union, CAM, Unitransfer USA, Inc., and Unibank to raise prices on telecommunication and money transfer services in direct violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, 47 U.S.C.§ 151 *et seq.* and the antitrust laws of the states of New York, California, Florida, and elsewhere.

223. Defendants Martelly, Privert, Moise, Unigestion Holding, NATCOM S.A., Western Union, CAM and Unitransfer USA, Inc. knowingly became a party to the price fixing agreements. These agreements are facially anticompetitive because they artificially raise

prices and limit competition among the Defendants. These agreements have eliminated price competition in the market for telecommunication and the money transfer services.

224. This conspiracy substantially affected and still affect interstate commerce in the United States as designed.

225. The agreement constituted unreasonable restraints of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1and the various antitrust laws of the states where the Defendants operate, including New York, California and Florida.

226. The aforesaid conspiracy consists of a continuing agreement, understanding, and concert of action among the Defendants, the substantial terms of which have been to:

(a) exchange proposals to change fees and negotiate increases to fees, and changes in fee restrictions;

(b) discriminate in the application of the increased fees on citizens and residents of the United States, Canada, Turks and Caicos, and the Bahamas;

(c) to raise, fix, maintain, and stabilize their fees on money and food remittances by US$1.50;

(d) to raise and fix, maintain, and stabilize their fees on all international calls to Haiti by US$0.05 per minute.

273.   For the purpose of forming and carrying out the combination and conspiracy, the Defendants and co-conspirators did those things that they combined and conspired to do, including, among other things:

    a.   telephoning, meeting, or otherwise contacting one another to collusively coordinate remittance and telephone calls price increases and resolve pricing differences;

    b.   meeting to discuss pricing strategies, to collusively coordinate the increase of prices and to discuss methods of dissemination of price coordination efforts;

    c.   agreeing, during those meetings and conversations, to charge US$1.50 as an alleged platform user fee to increase and maintain prices of money and food transfer provided in the United States and elsewhere;

    d.   agreeing, during those meetings and conversations, to charge US$ 0.05 as an alleged fee to combat phone fraud to increase and maintain prices of telephone calls per minute effectuated in the United States and elsewhere.

    e.   issuing price announcements and fraudulently describing such prices as taxes in accordance with the agreements reached; and

    f.   agreeing to market, advertise, and take all necessary measures, including but not limited to verbal and/or acts and conducts to identify the agreed upon price increase as a tax lawfully imposed on services and phone calls effectuated in the

United States for the purpose of deceiving consumers in the United States and elsewhere.

274. As a direct and proximate result of this conspiracy, the Plaintiffs and Class Members have been injured in their business or property because they have had to purchase telecommunication and money transfer services at higher-competitive prices, and Defendants Martelly, Privert, Moise, Unigestion Holding, NATCOM S.A., Western Union, CAM, and Unitransfer USA, Inc, and Unibank S.A. have enjoyed ill-gotten gains from the sales of telecommunication and money transfer services.

## COUNT II
**(Violation of New York General Business Law § 349 (Deceptive Acts and Practices)**
**(On behalf of the Nationwide Classes)**

275. Plaintiffs repeat and re-allege every preceding allegation as if fully set forth herein.

276. Each of the Defendants' primary liability, and controlling person liability, arises from the following facts: (1) Individual Defendants were high-ranking public figures/officials, high-level executives, directors, and/or companies during the Class Period and members of the government of Haiti and/or companies' management team or had control thereof; (2) each of these Defendants, by virtue of his responsibilities and activities as high ranking public figure, senior officer and/or director of the companies described herein, were privy to and participated in the creation, development and reporting of the tax scheme; (3) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to the other Defendants' management team, internal reports and other data and information about the true nature

of the fees advertised as Taxes at all relevant times; and (4) each of these Defendants were aware of the other Defendants' dissemination of information and/or conducts to the consuming public which they knew or recklessly disregarded was materially false and misleading.

277. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly.

278. New York General Business Law § 349 ("GBL § 349") prohibits "deceptive acts   or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York]."

279. Defendants Martelly, Moise, Privert together with their agents Western Union, CAM, UNITRANSFER USA, UNIBANK S.A., Digicel-Haiti, and NATCOM, S.A. are, and at all relevant times herein were, engaged in consumer-related activities that affected consumers at large who regularly send money and/or make telephone calls to Haiti.

280. Upon information and belief, at all relevant times herein, Defendants utilized tactics that were and are deceptive and misleading in material respects, exposed the public to sales tactics through various mediums that were and are false and misleading in relevant respects and led to Plaintiffs' injury as a result.

281. Throughout the Class Period, Defendants intending to mislead consumers, implied and expressly represented to Plaintiffs and other Class that a US$1.50 and US$0.05 charge added to the price of the transfer service and telephone calls are taxes collected to be remitted to the Government of Haiti to finance the free education program.

282. Defendants Western Union, CAM, and UNITRANSFER USA, by virtue of adding the US$1.50 to the overall amount of the money being transferred, treating it separately on the receipts as a fee under the guise that it is an education tax, excluding it from their gross receipts, and otherwise telling consumers that it was for the "National Education Funds."

283. Throughout the Class Period, Defendants Western Union, CAM, Unitransfer USA, Inc., Unibank S.A., Unigestion Holding and NATCOM S.A., acting as agents of Defendants Martelly, Privert, Moise and, the Government of Haiti, added US$0.05 per minute on all outgoing calls to Haiti and US$1.50 to all money transfer to and from Haiti while representing such a charge as a special tax designed to fund free education.

284. Throughout the Class Period, Defendants' willfull ongoing action violates New York General Business Law § 349

285. Defendants' aforesaid deceptive misconduct also includes, *inter alia*:

- conveying to members of the general public that the fees of US$1.50 on money transfers and US$0.05 per minute on telephone calls to Haiti are mandatory taxes imposed by law to fund free and compulsory education in

Haiti (program known as "PSUGO");

- marketing and advertising the aforesaid fees as taxes or hiding the true nature of the fees charged;

- training and instructing Agents not to disclose the true nature of the fees charged;

- training and instructing Agents to request consumers to pay the US$1.50 as a tax upon effectuating a money transfer in the United States.

- discriminating against the citizens and residents of the United States because they can a afford to pay the "Education Fees" charged;

289. The Defendants' aforementioned misleading and deceptive practices violate the consumer protection provisions of § 349 of the New York General Business Law.

290. As a result of Defendants' violations of General Business Law § 349, Plaintiffs and the other Class Members are entitled under General Business Law § 349 (h) to recover damages in an amount to be determined at trial.

291. By reason of the foregoing, Plaintiffs are entitled to payment of their attorneys' fees.

292. As to prospective relief, Plaintiffs have no remedy at law.

## <u>COUNT III</u>
### (Violation of New York General Business Law § 350 (False Advertising))

293. Plaintiffs repeat and re-allege every preceding allegation as if fully set forth herein.

294. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and or to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly.

295. Throughout the Class Period, Defendants Martelly and Unigestion Holding, S.A.'s advertisements contain untrue and materially misleading statements concerning the fees charged inasmuch as they misrepresent the charged fees as lawful taxes levied to fund "free and compulsory education;" such misleading statements were adopted by the other named Defendants through their acts and conducts.

296. Plaintiffs and the Class Members and all consumers nationwide have been injured inasmuch as they relied upon the advertising and paid additional fees which were— contrary to Defendants' representations—not "lawful taxes levied to fund free and compulsory education" to benefit the Haitian population including Plaintiffs' relatives.

297. Plaintiffs and Class Members did not receive the benefits of such bargain. Defendants collected the fees and converted them to their own use. Accordingly, Plaintiffs and other Class members have been deprived of their property.

298. Defendants' advertising induced the Plaintiffs and Class Members to pay the added fees.

299. Defendants made their false and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

300. Defendants' conducts constitute a violation of N.Y. Gen. Bus. Law § 350.

301. Defendants made the material misrepresentations described in advertising, during press conferences, and when charging consumers on each transaction where the monies were collected for money transfer or on phone calls.

302. Defendants' material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large. All consumers sending money and making calls to Haiti were and continue to be exposed to Defendants' material misrepresentations.

303. As a result of Defendants' recurring, "unlawful" deceptive acts and practices, Plaintiffs and Class Members are entitled to monetary, compensatory, treble and punitive damages, injunctive relief, restitution and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs.

## COUNT IV

**(Violation of the Florida Deceptive And Unfair Trade Practices Act § 501.201 *et seq.*)**

304. Plaintiffs re-allege and incorporate by reference every preceding allegation as if fully set forth herein.

305. Section 501.204(1), Florida Statutes, indicates "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

306. As set forth in the paragraphs above, Defendants have engaged in a pattern of misinformation and deception with regards to the true nature of the US$1.50 fee and the true nature of the PSUGO program.

307. Defendants have engaged in or are engaging in representations, acts, practices or omissions which are material and are likely to mislead consumers, have committed and are committing acts or practices in trade or commerce which offend established public policy and are unethical, oppressive, unscrupulous or substantially injurious to consumers.

308. Defendants have engaged in and are engaging in unfair or deceptive or unconscionable acts or practices in the conduct of any trade or commerce in violation of § 501.204(1), Florida Statutes.

309. Defendants acts and conducts violate Chapter 501, Part II of the Florida Statutes, through false and misleading advertising which is prohibited by §§ 817.06 AND 817.41.

310. Defendants have made, disseminated, and continue to make and disseminate, information to consumers that are untrue, deceptive, or misleading with regard to the true nature of the US$1.50 on every money transfer and US$0.05 per minute on every phone call to Haiti.

311. Defendants made and disseminated and continue to make and disseminate "misleading advertising" in violation of Florida Statute § 817.40(5), which are statements to and before the public, which are known, or through the exercise of reasonable care or investigation could or might be ascertained to be untrue or misleading, and which are so made or disseminated with the intent or purpose of selling services and to induce the public to enter into obligations relating to such services.

---

312. These above-described acts and practices of Defendants have injured and will likely continue to injure and prejudice the Plaintiffs and other Class Members.

313. Defendants, by disseminating false and misleading advertisements, violated §§ 817.06(1), Florida Statutes, and 817.41(1), Florida Statutes, and therefore engaged in deceptive and unfair acts and practices in trade or commerce, in violation of § 501.204(1), Florida Statutes, and are subject to civil penalties and equitable remedies as imposed therein.

314. Unless Defendants are enjoined from engaging further in the acts and practices complained of, the continued activities of Defendants will result in irreparable injury to the Plaintiffs and Class Members for which there is no adequate remedy at law.

## COUNT V
### (Civil Theft Pursuant to Florida Statute §772.11)

315. Plaintiffs repeat and re-allege every preceding allegation as if fully set forth herein.

316. This is an action for civil theft pursuant to Fla. Stat. §772.11.

317. Defendants have obtained and/or used approximately US$1,000,000,000.00 of Plaintiffs and other Class Members' money without their permission through fraudulent means.

318. Throughout the Class Period, Plaintiffs never consented to paying the extra fees to send money or make phone calls to Haiti.

319. Throughout the Class Period, Plaintiffs believed that they had no choice but to pay the extra fees because Defendants have the power to exercise dominion over Plaintiffs' money and take out the fees.

320. Throughout the Class Period, Defendants did unlawfully and knowingly use or endeavor

CLASS ACTION SECOND AMENDED COMPLAINT
Celestin et al. vs. Martelly et al.
Case No. 18-cv-7340 (LDH) (PK)

to use Plaintiffs' money and did knowingly deprive or endeavor to deprive Plaintiffs and the other members of the Nationwide Classes of their money with the intent to temporarily or permanently deprive Plaintiffs and the other members of the Nationwide Classes of their rights to the money and benefit thereof, all for Defendants' own use, or the use of any person not entitled thereto, in violation of Florida Statute §812.014.[9]

321. Pursuant to Florida Statute §772.11, Plaintiffs made a final written statutory demand for its property on or about October 5th, 2018 on all Defendants. To date, and despite demand by Plaintiffs, Defendants have failed to return Plaintiffs' property.

322. As a direct and proximate cause of Defendants' unlawful actions, Plaintiffs were and continue to be deprived of their rights to their property and the benefits therefrom and have suffered damages in the minimum amount of $1,000,000,000.00.

323. Pursuant to Florida Statute §772.11, Plaintiffs are entitled to treble damages in the minimum amount of $3,000,000,000.00 for the theft of their money committed by Defendants.

324. As a direct result of Defendants depriving Plaintiffs of their rights to possess and enjoy their money and the benefits therefrom, and Defendants' continuing failure and refusal to

---

9.    Fla. Stat. §812.014 provides, (1) A person commits theft if he or she knowingly obtains or uses, or endeavors to obtain or to use, the property of another with intent to, **either temporarily or permanently:**
      (a) **Deprive the other person of a right to the property or a benefit from the property.**

return Plaintiffs' property, Plaintiffs were required to retain counsel and are obligated to pay their counsel a fee.

325.    Plaintiffs are entitled to an award of attorneys' fees pursuant to Fla. Stat.§772.11.

## <u>COUNT VI</u>

### (Violation of California Business & Professions Code § 17500 *et seq.*)

326.    Plaintiffs repeat and re-allege every preceding allegation as if fully set forth herein.

327.    Throughout the Class Period, Defendants engaged in a public advertising and marketing campaign representing the unlawful fees as "lawful taxes imposed to fund free and compulsory education in Haiti."

328.    The fees collected as taxes are in in fact "bank fees and telephone services fees." Defendants' advertisements, marketing and representations to consumers are therefore, misleading, untrue, have misled and will continue to deceive the public.

329.    Defendants engaged in their advertising and marketing campaign with intent to directly induce consumers to pay extra moneys based on false claims.

330.    In making and disseminating the statements alleged herein, Defendants knew or should have known that the statements were untrue or misleading.

331.    Plaintiffs and other Class members believed Defendants' misrepresentations that the extra fees paid are "lawful taxes imposed to fund free and compulsory education in Haiti."

332.    Plaintiffs and other members of the Nationwide Classes would not have paid the extra money as fees had they known the moneys were bank fees and phone services fees

charged by the Government of Haiti through their agents.

333.    Plaintiffs and other members of the Nationwide Classes were injured in fact and lost money as a result of Defendants' conduct of improperly describing the extra fees paid as "lawful taxes imposed to fund free and compulsory education."

334.    Plaintiffs paid the extra moneys as taxes in exchange for Defendants' promise to provide free and compulsory education to the Haitian population including Plaintiffs' relatives but, did not receive the benefits of such bargain. Defendants collected the money and converted them to their own use.

### COUNT VII

**(Violation of California Business & Professions Code § 17200 *et seq.*)**

335.    Plaintiffs repeat and re-allege every preceding allegation as if fully set forth herein.

336.    By engaging in the acts and practices described above, Defendants committed one or more acts of "unfair competition" within the meaning of Business and Professions Code § 17200. "Unfair competition" is defined to include any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [Business and Professions Code § 17500 *et seq.*]."

337.    Defendants committed "unlawful" business acts or practices by, among other things, violating California Business & Professions Code § 17500.

338.    Defendants committed "unfair" business acts or practices by, among other things by:

    a.   engaging in conduct where the utility of such conduct, if any, is outweighed by the gravity of the consequences to Plaintiffs and members of the California Classes;

    b.   engaging in conduct that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiffs and members of the California Classes; and

    c.   engaging in conduct that undermines or violates the spirit or intent of the consumer protection laws alleged in this Complaint.

339. Defendants committed unlawful, unfair and/or fraudulent business acts or practices by, among other things, engaging in conduct Defendants knew or should have known was likely to and did deceive the public, including Plaintiffs and other members of the Nationwide Classes.

340. Defendants unlawful, unfair, and/or fraudulent practices include making false and/or misleading representations that the extra fees collected through the transactions were "lawful taxes imposed to fund free and compulsory education in Haiti."

341. Plaintiffs and the other members of the Nationwide Classes were injured in fact and lost money because of Defendants' conduct of improperly describing the extra fees paid as "lawful taxes imposed to fund free and compulsory education."

342. Plaintiffs and the members of the Nationwide Classes seek declaratory relief, restitution for moneys wrongfully obtained, disgorgement of ill-gotten revenues and/or profits, injunctive relief, and other relief allowable under California Business & Professions Code Section 17203, including, but not limited to, enjoining Defendants from continuing to

engage in their deceitful, unfair, unlawful and/or fraudulent conduct as alleged.

## COUNT VIII
### (Violation of the California Consumers Legal Remedies Act - Cal. Civ. Code § 1750 *et seq.*)

343.   Plaintiffs repeat and re-allege every preceding allegation as if fully set forth herein.

344.   Plaintiffs bring this claim individually and on behalf of the Nationwide Classes pursuant to the California Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.* (the "CLRA"). This cause of action seeks monetary damages and injunctive relief pursuant to California Civil Code § 1782.

345.   On or about October 5, 2018, Plaintiffs sent Defendants a Notice and Demand Letter, notifying Defendants of their violations of the CLRA. Defendants did not correct the misrepresentations identified in the demand letter.

346.   Defendants' actions, representations, and conduct have violated, and continue to violate, the CLRA because they extend to transactions that are intended to result, or that have resulted, in the money transfer transaction entered with consumers.

347.   Plaintiffs and all members of the Nationwide Classes are "consumers" as that term    is defined by the CLRA in California Civil Code § 1761(d).

348.   Defendants entered into "transactions," within the meaning of California Civil Code § 1761(e), with Plaintiffs and other members of the Nationwide Classes.

349.   By engaging in the actions, misrepresentations, and deceitful conduct set forth in this Class Action Complaint, Defendants violated, and continue to violate, California Civil Code § 1770(a)(5) by misrepresenting that the fees paid as "lawful taxes levied" and have

particularly stated that such tax revenues "were going to fund free and compulsory education in Haiti," when in fact, they are not.

350.    By engaging in the actions, misrepresentations, and deceitful conduct set forth in this Complaint, Defendants violated, and continues to violate, California Civil Code § 1770(a)(14) by misrepresenting that the subject transaction confers or involves rights, remedies, or obligations that it does not have or involve, or that are prohibited by law.

351.    Defendants violated the CLRA by not representing through its advertisements the true nature of the transaction resulting in the payment of extra fees as described above when they knew, or should have known, that the representations and advertisements were unsubstantiated, false, deceitful, and misleading.

352.    Plaintiffs and the other members of the Nationwide Classes believed Defendants' representations to their detriment.  Plaintiffs and the other members of the members of the Nationwide Classes were injured in fact and lost money.

353.    Plaintiffs request that this Court enjoin Defendants from continuing to employ the unlawful methods, acts, and practices alleged herein pursuant to California Civil Code § 1780(a)(2).

354.                              **<u>COUNT IX</u>**

**(Intentional Misrepresentation Under New York Law)**

355.    Plaintiffs repeat and re-allege every preceding allegation as if fully set forth herein.

356.    Throughout the Class Period, Defendants, while contracting with Plaintiffs and other Nationwide Class Members, have intentionally misrepresented a material fact about the

transactions by claiming that the extra fees are "lawful taxes levied to fund free and compulsory education program;" or by purposely failing to offer a description for the line item containing the fees.

357. At the time Defendants made the misrepresentations herein alleged, Defendants knew the fees were not "lawful taxes" levied.

358. Defendants misrepresented the extra fees as "lawful taxes" with the purpose of inducing Plaintiffs' and the Nationwide Class members' reliance and inducing Plaintiffs and the Nationwide Class members to contract with them and pay the extra fees.

359. Plaintiffs and the Nationwide Class Members reasonably relied on Defendants' representations that the extra fees were "lawful taxes" and, in reasonable reliance thereon, did contract with Defendants and pay the extra fees.

360. Plaintiffs and the other members of the Nationwide Classes were injured in fact and lost money because of Defendants' conduct of improperly describing the extra fees paid as "lawful taxes imposed to fund free and compulsory education."

361. Plaintiffs paid the extra fees as taxes in exchange for Defendants' promise to provide free and compulsory education to the Haitian population including Plaintiffs' relatives but, did not receive the benefits of such bargain. Defendants collected the extra fees and converted them to their own use.

## COUNT X

### (Intentional Misrepresentation Under Florida Law)

362. Plaintiffs repeat and re-allege every preceding allegation as if fully set forth herein.

363. Throughout the Class Period, while transacting with Plaintiffs and other Class members, Defendants have intentionally misrepresented a material fact by claiming that the extra fees are "lawful taxes levied to fund a free and compulsory education program," or by purposely concealing the true nature of the fees or failing to offer a description for the line item containing the fees.

364. At the time Defendants made the misrepresentations herein alleged, Defendants knew the extra fees were not "lawful taxes levied."

365. Defendants misrepresented the fees as "lawful taxes levied" or concealed their true nature with the purpose of inducing Plaintiffs' and the Class Members' reliance and inducing Plaintiffs and the Class members to contract with them and pay the extra fees.

366. Plaintiffs and the Class Members reasonably relied on Defendants' misrepresentations that the extra fees were "lawful taxes levied" and, in reasonable reliance thereon, transacted with Defendants and paid the extra fees.

367. Plaintiffs and the other members of the Class were injured in fact and lost money because of Defendants' conduct of improperly describing the extra fees paid as "lawful taxes imposed to fund free and compulsory education."

368. Plaintiffs paid the extra fees as taxes in exchange for Defendants' promise to provide free and compulsory education to the Haitian population including Plaintiffs' relatives but, did not receive the benefits of such bargain. Defendants collected the extra fees and converted them to their own use.

## COUNT XI

### (Intentional Misrepresentation Under California Law)

369.   Plaintiffs repeat and re-allege every preceding allegation as if fully set forth herein.

370.   Throughout the Class Period, while transacting with Plaintiffs and the other Nationwide Class members, Defendants have intentionally misrepresented a material fact by claiming that the extra fees are "lawful taxes levied to fund a free and compulsory education program" or by purposely failing to offer a description for the line item containing the fees.

371.   At the time Defendants made the misrepresentations herein alleged, Defendants knew the extra fees were not "lawful taxes levied."

372.   Defendant misrepresented the fees as "lawful taxes levied" with the purpose of inducing Plaintiffs and the Nationwide Class members' reliance and inducing Plaintiffs and the Class members to contract with them and pay the extra fees.

373.   Plaintiffs and the Nationwide Class members reasonably relied on Defendants' representations that the extra fees were "lawful taxes levied" and, in reasonable reliance thereon, transacted with Defendants and paid the extra fees.

374.   Plaintiffs and the Nationwide Class members were injured in fact and lost money because of Defendants' conduct of improperly describing the extra fees paid as "lawful taxes imposed to fund free and compulsory education." Plaintiffs paid the extra fees as taxes in exchange for Defendants' promise to provide free and compulsory education to the Haitian population including Plaintiffs' relatives but, did not receive the benefits of such

bargain. Defendants collected the extra fees and converted them to their own use.

**COUNT XII**
**Unjust Enrichment**

375.  Plaintiffs repeat and re-allege every preceding allegation as if fully set forth herein.

376.  Defendants, as alleged are high-ranking officials of the Haitian government, Money
      Transfers Operators and Telecommunications companies who transacted with Plaintiffs
      and the other Class Members representing that the $1.50 on every money transfer and
      $0.05 per minute on every phone call made to and from Haiti are fees collected as
      "lawful taxes levied to fund a free and compulsory education program."

377.  Defendants' representations about the fees collected were false. The fees are the result of
      unlawful conduct of Defendants who entered into horizontal price-fixing agreements
      which are memorialized by two circulars and a presidential order issued in contravention
      of the laws of Haiti.

378.  Defendants collected the fees under the ruse that they are taxes levied to fund a free and
      compulsory education program in Haiti. Contrary to the representations made by
      Defendants, the fees collected are converted to the personal and private use of the
      Defendants.

379.  Defendants have unjustly enriched themselves in retaining revenues derived from
      Plaintiffs and the other Class members who paid the fees under these circumstances.

380.  Defendants' misrepresentations caused Plaintiffs and the other Class Members harm and
      unjustly enriched Defendants because Plaintiffs and the other Class Members would not

have paid the extra fees they did, had the true facts been known.

381. Defendants retention of the non-gratuitous benefits conferred on them by Plaintiffs and the other Class Members as a result of these misrepresentations is unjust and inequitable.

<u>**COUNT XIII**</u>
**FRAUD**

382. Plaintiffs repeat and re-allege every preceding allegation as if fully set forth herein.

383. Defendants representations regarding the fees collected were false. The fees are the result of the unlawful horizontal price-fixing agreements entered into by Defendants which are memorialized by two circulars and a presidential order issued in contravention of the laws of Haiti.

384. Defendants collected the fees from Plaintiffs and Class Members under the ruse that they are taxes levied to fund a free and compulsory education program in Haiti. Contrary to the representations made by Defendants, the fees collected are converted to the personal and private use by the Defendants.

385. Defendants know that the collection of the $1.50 and $0.05, was unlawful because they all conspired to set the fees to be collected not the Haitian legislature.

386. Defendants' misrepresentations were intended to induce and actually induced Plaintiffs and the Class to contract with Defendants. In transacting with Defendants, Plaintiffs and the Class reasonably and justifiably relied on Defendants' fraudulent representations.

387. Plaintiffs and the Class were damaged through transacting with Defendants under these circumstances. Plaintiffs and the Class would not have contracted with Defendants or paid the extra fees they did, had the true facts been known.

## COUNT XIV
## CONVERSION

388. Plaintiffs repeat and re-allege every preceding allegation as if fully set forth herein. .

389. Defendants' retention of Plaintiffs and Class Members' property despite Plaintiffs' request for its return constitutes conversion, because Defendants have willfully and without lawful justification appropriated Plaintiffs and Class Members' property without their consent.

390. The Defendants willfully interfered with Plaintiffs and the Class Members rights to their personal property. Defendant willfully through a fraudulent scheme charged consumers in the United States an additional fee of US$1.50 on every money transfer and US$0.05 per minute on every international phone call placed to Haiti.

391. Defendants intentional and deceitful acts enabled it to dispose of the property in a manner inconsistent with Plaintiffs and Class Members property rights. These property rights include disclosure of the true nature of the additional funds collected.

392. Defendants' unauthorized collection and retention of the Plaintiffs and the Class Members property as described herein caused substantial damages to Plaintiffs and Class Members.

## COUNT XV
For Violation of the Communication Act, 47 U.S.C. § 151 *et seq*.

(**On Behalf of Plaintiff and the Class Members** )

393. Plaintiffs repeat and re-allege every preceding allegation, as if fully set forth herein.

394.    Under the act, Unigestion Holding and NATCOM S.A. are "common carriers" or "telecommunications carriers" as they engage in interstate or foreign communications by offering to transmit information for a fee between points designated by consumers. See 47 U.S.C. §§ 153(11), (50), (51), (53) (defining, respectively, "common carrier," "telecommunications," "telecommunications carrier," and "telecommunications service")

395.    Section 153 (21) of the Act states that a "foreign communication" is a "communication or transmission from or to any place in the United States to or from a foreign country."

396.    The Act applies to "all interstate and foreign communication . . . which originates and/or is received within the United States, and to all persons engaged within the United States in such communication." See 47 U.S.C. § 152(a).

397.    Any person damaged by a common carrier's acts or omissions that violate the terms of the Act may recover damages in federal court. 47 U.S.C. §§ 206-207.

398.    Defendants Unigestion Holding and NATCOM S.A., have discriminated against Plaintiffs and other Class Members in that they made an unjust and unreasonable discrimination in charging a class of people making phone calls to Haiti in violation of 47 U.S.C. §§ 206

399.    Defendants Unigestion and NATCOM S.A. have further discriminated against Plaintiffs and the other Class Members by giving an undue, unreasonable preference and advantage to Defendant Martelly and cohorts, while subjecting Plaintiffs and other Class Members to undue, unreasonable prejudice, and disadvantage with the illegally raised US$0.05 per minute on international calls to Haiti.

400.    Plaintiff and Class Members have been damaged and will continue to be damaged by Defendants' discrimination as more fully set out above.

401.    Plaintiffs and other Class Members are entitled to a full recovery of the harm sustained together with attorney fees because the action committed by Defendants Unigestion Holding and NATCOM, S.A. is prohibited by the Act.

## <u>COUNT XVI</u>

### Violation of New York Banking Law § 131

402.    Plaintiffs repeat and re-allege every preceding allegation, as if fully set forth herein.

403.    Upon information and belief, Defendant Unibank S. A. is a bank incorporated in Haiti.  It is not licensed to conduct banking activities in any state in the United States.

404.    Upon information and belief, Unibank S. A., by and through its subsidiary Unitransfer USA, accepts deposits from consumers in the United States who maintain accounts with Unibank S.A.

405.    Unitransfer USA is the agent  through  which  the  deposits  are  made  and  credited  to consumers accounts held with Unibank S.A.

406.    Upon information and belief, Unitransfer is licensed in New York as a money transfer operator and does not have banking privileges including but not limited to depository activities.

407.   Unibank S.A. and Unitransfer USA are in violation of New York Banking Law § 131 when they caused Unibank S.A. account holders to deposit moneys into their accounts through Unitransfer USA and charging the illegal US$1.50 imposed on said deposits

408.   Plaintiff and Class Members have been damaged and will continue to be damaged by Defendant Unibank S.A.'s unlawful act as more fully set out above.

409.   Plaintiffs and other Class Members are entitled to a full recovery of the harm sustained together with attorney fees because the action committed by Defendant Unibank S.A. is prohibited under New York Banking Law § 131.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Classes described in this Complaint, respectfully request that:

A.   The Court certify the Nationwide Classes pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3), and adjudge Plaintiffs and their counsel to be adequate representatives thereof;

B.   Alternatively, the Court certify the NY-FL-CA Classes pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3), and adjudge Plaintiffs and their counsel to be adequate representatives thereof;

C.   The Court enter an Order requiring Defendants to pay to Plaintiffs and other members of the Classes economic, monetary, consequential, compensatory, or statutory damages, whichever is greater; and, if Defendants' conducts prove willful, awarding Plaintiffs and

the other members of the Classes exemplary damages to the extent provided by law;

D.      The Court enter an Order awarding restitution and disgorgement of all moneys Defendants acquired by means of any act or practice declared by this Court to be wrongful, or any other appropriate remedy in equity, to Plaintiffs and the other members of the Classes;

E.      The Court enter an Order awarding declaratory and injunctive relief as permitted by law or equity, including: enjoining Defendants from continuing the unlawful practices set forth above; directing Defendants to cease their deceptive and misleading marketing and collection campaign in which they describe the extra fees as "lawful taxes levied to fund free and compulsory education;" and directing Defendants to disgorge all moneys Defendant acquired by means of any act or practice declared by this Court to be wrongful;

F.      The Court enter an Order directing the Defendants to give a full accounting of all funds collected relating to US$1.50 and US$0.05 respectively for the last 8 years in question, beginning May 2011 to date.

G.      The Court enter an Order declaring that the conduct alleged herein constitutes unlawful price-fixing in violation of Sections 1 of the Sherman Antitrust Act; the New York Donnelly Act, New York common law, Cartwright Act, California common law, Florida common law, and New York Banking Law § 131;

H.      The Court enter an Order declaring that the conduct alleged herein constitutes price discrimination in violation of the Communication Act, 47 U.S.C. § 151 et seq.;

I.     The Court enter an Order declaring that the Government of Haiti together with its officials, employees, and/or agents waived any immunity they may have had, as a result of their deceitful and misleading conducts in a relation to their commercial activities here in the United States;

J.     The Court enter an Order awarding Plaintiffs, individually and on behalf of the other members of the Classes, their expenses and costs of suit, including reasonable attorneys' fees and reimbursement of reasonable expenses, to the extent provided by law;

K.     The Court enter an Order awarding to Plaintiffs individually and on behalf of the other members of the Classes pre- and post-judgment interest, to the extent allowable; and

L.     For such other and further relief as may be just and proper.

## JURY TRIAL DEMANDED

Plaintiffs and the Class members hereby demand a trial by jury.

Dated: April 24, 2019.

Respectfully submitted by

s/ MARCEL P. DENIS_____
MARCEL P. DENIS
**DENIS LAW GROUP, PLLC**
9602 Avenue L
Brooklyn, New York 11236
Telephone:     (404) 977-9733
Facsimile:     (917) 810-3816
Email:        *mdcounsel@gmail.com*

Rodney R. Austin
**RODNEY R. AUSTIN PLLC**
61-43 186th Street
Fresh Meadows, New York 11365
Telephone:     (718) 475-2119

Facsimile:     (877) 586-7490
Email:          rodney@raustinlaw.com

CLASS ACTION SECOND AMENDED COMPLAINT
Celestin et al. vs. Martelly et al.
Case No. 18-cv-7340 (LDH) (PK)