UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ODILON S. CELESTIN, WIDMIR ROMELIEN, MARIE LUCIE ST VIL, GORETTIE ST VIL, JEANNETTE VALEUS, GUETTY FELIN, HERVE COHEN, and on behalf of all others similarly situated,<br><br>　　　　　　　　　Plaintiffs,<br><br>　　- against -<br><br>MICHEL JOSEPH MARTELLY, JOCELERME PRIVERT, JOVENEL MOISES, THE WESTERN UNION COMPANY, d/b/a Western Union Holdings, Inc, Western Union Financial Services, Inc., and through other subsidiaries and affiliates, CARIBBEAN AIR MAIL, INC., d/b/a CAM, UNIBANK, S.A., UNITRANSFER USA, INC., UNIGESTION HOLDING, S.A., d/b/a DIGICEL HAITI, NATCOM S.A., and THE GOVERNMENT OF HAITI,<br><br>　　　　　　　　　Defendants. | 18-cv-7340 (LDH) (PK)<br><br>ECF CASE<br><br>DECLARATION OF PIERRE MAX ANTOINE |

　　　I, Pierre Max Antoine, declare under penalty of perjury, pursuant to 28 U.S.C. §1746, that the following is true:

1.　　I am a practicing attorney in good standing with the bar of Port-au-Prince, Haiti.

2.　　I am the Managing Partner at Cabinet Antoine & Associates, in Port-au-Prince, Haiti. I have a general practice that includes work related to litigation, labor, criminal, human rights, and business law. As a result, I am familiar with the Haitian court system and its Code of Civil Procedure.

3.　　I obtained a law degree from the Université d' État d'Haïti in 1964.

1

4. I joined Cabinet Lionel Lubin, Esq. in 1964 and have acquired legal expertise in litigation, business law, criminal law, labor law, and human rights. I represent clients in many different legal matters before Haitian courts.

5. I served as a professor of law at the Université d' État d'Haïti (School of Human Sciences) and Institut National d'Administration de Gestion et des Hautes Études Internationales (INAGHEI); I also served as a professor of Ethnomusicology at the School of Ethnology of the Université d' État d'Haïti from 1995 until 1996.

6. I also served as a professor of West African and Pacific Islanders' Arts at Ecole Nationale des Arts (ENARTS/National School of Arts) from 1995 until 1996.

7. I served as legal consultant for the Minister of Justice and Public Safety and the Minister of Haitians Living Abroad (MHAVE) from 1995 to 1996.

8. I also served as the Minister of Justice and Public Safety for the administration of the late René Préval from March 1996 until March 1999.

9. One of my preoccupations as Minister of Justice was to bring about meaningful changes in the judicial system In keeping with Article 161 of the Constitution coupled with the recommendations of the committee I commissioned to prepare a report on judicial reform, I introduced a bill titled "LOI SUR LA RÉFORME JUDICIARIE/Law on Judicial Reform." The bill was signed into law on December 18, 1997 and published in the official paper le Moniteur on August 17, 1998 under publication number 61, yet to date, there has not been any implementation of the reforms ordered by the law.

10. I have been retained by the Plaintiffs in the above-captioned case to opine on issues of Haitian law relevant to their defense of the Defendants' motion to dismiss for Act-of-State and Forum non conveniens.

11. In preparation to write the present declaration, I reviewed the Plaintiffs' Second Amended Complaint, ("SAC") the Defendants' joint memorandum of law in support of their motion to dismiss, the declaration of Frédéric Salès together with other related documents.

12. I also reviewed the relevant Haitian laws, Circulars, and Presidential Order referenced in the SAC as well as cases, treatises, and other legal materials relevant to the subject matter discussed herein.

13. I will not address every paragraph found in Mr. Salès' declaration because his recitation of Haiti's Civil Code and the Code of Civil Procedure is beyond reproach. Therefore, I will address only Mr. Salès' talking points and refer to certain paragraph for emphasis when necessary.

14. In theory, Haiti's judicial system is as sound as any other system in the world but, in reality, it reflects the state of the country's economy. It is among the worst in the world because of its corrupt nature resulting from the stronghold exercise by the executive and legislative branches.

**Haitian Court System**

15. While Mr. Salès offers more of a picture-perfect synopsis of a dysfunctional judicial system, I agree with him for the most part with his recitation of the historical details of the Haitian judicial system being born out of the French civil law system in 1826. The system continues to deny access to due process, "including the right to notice of proceedings, the right to be heard, the right to present evidence and examine witnesses, and the right to counsel" to the African population of Haiti of which the Plaintiffs are members of. See Salès Decl. ¶ 12.

16. The Haitian's judicial system does not operate independently. The Supreme Council of the Judicial Branch (Conseil Supérieur du Pouvoir Judiciaire, hereinafter "CSPJ"), though "the highest administrative authority of the judicial system," exists to serve the executive branch. It has no way of funding itself; the executive, while embezzling, decides when to pay the judges and which judges should get paid. It cannot act on its own, but to bend to the will of the executive. Salès Decl.¶13.

17. In fact, in a letter published on May 5, 2019 in one of the most read newspaper of Haiti, "Le Nouvelliste," the president of the Association of Judges announced that they would go on strike as of May 20, 2019 until the judicial system is rendered wholly independent.

18. Pursuant to said published letter, the judges would remain out on strike until certain issues were resolved including but not limited to : a) Total transfer of authority from the Minister of Justice to the CSPJ pursuant to the memorandum of understanding entered into by and between the parties on October 20, 2017; b) Renew the appointment of all judges who received a positive recommendation and c) Cease all forms of interference in the Judicial Power.[1]

19. The letter published on May 5, 2019 by the president of the Association of Judges refutes the notion that "the courts, and judges being free from the influence of the executive branch. Salès Decl. ¶¶13,14.

20. The judges went on strike for two weeks as promised in their letter. The judiciary, as attested by the president of the Association of Judges, is controlled by the executive through the Minister of Justice who decides when and who gets paid. As a result, courts

---

[1] The letter cited is accessible at :https://lenouvelliste.com/article/201937/position-des-associations-des-magistrats-et-des-juges-de-paix. Last visited June 7, 2019.

4

and tribunals are poorly staffed and maintained, the system is not modernized, and judges go years without getting paid. Salès Decl. ¶13.

21. The facts as pleaded in Plaintiffs' SAC allege that Defendants Martelly, Privert, and Moise have committed a crime of high treason; as such, they can only be tried by the court of high justice (The Senate) as established by Article 185 of the Constitution. *See* Plaintiffs' SAC ¶¶56,57,59-75,82,83,187-190,194,198,200-208.

22. Article 21 of the Haitian Constitution's definition of crime of high treason includes: … any official's stealing state property entrusted to his management, or any violation of the Constitution by those responsible for enforcing it.[2]

23. The Plaintiffs in their SAC allege that Defendant Martelly embezzled funds collected to supposedly fund education, in violation of the Constitution of Haiti with the issuance of a Presidential Order together with two Circulars calling for collection of fees that they represented to the general public as taxes designed to fund education. See Plaintiffs' SAC ¶¶56,57,59-75,82,83,187-190,194,198,200-208.

24. My review of the Presidential Order and Circulars does reveal that the Plaintiffs' allegations are well informed. Articles 136 through 147 detailed the powers of the President of Haiti, and signing Presidential Orders is not one of them. Further, Article 150 of the Constitution limits the President's powers to only "those accorded to him by the Constitution."[3]

---

[2] Article 21 of the Haitian Constitution reads: The crime of high treason consists in bearing arms in a foreign army against the Republic, serving a foreign nation in a conflict with the Republic, any official's stealing state property entrusted to his management, or any violation of the Constitution by those responsible for enforcing it.

[3] Article 150 reads: The President of the republic shall have no powers other than those accorded to him by the Constitution.

25. Therefore, by executing the President Order as Defendant Martelly and former Prime Minister Jean-Max Bellerive did, they breached the Constitution; thereby, they committed a crime of high treason.

26. In addition to Articles 136-147 and 159 that delineate the powers of the President and the Prime Minister, Article 18 of the May 17, 2005 Decree Organizing the Central Government allows the President to affix his signature on an Order solely to create an ad hoc presidential committee to study strategic questions of national interest; while Article 26 sets out the powers that the Prime Minister, which are as follows: power to nominate; to discipline; to manage; to instruct; to reform; and to regulate.

27. Nowhere in the Constitution or the May 17, 2005 Decree does it say that the President and/ or the Prime Minister have the power to legislate.[4]

28. Matter of fact, Article 111 of the Constitution assigned the power to legislate solely to the legislative branch.[5]

29. In executing the Presidential Order upon which the collection of the US$0.05 is collected, both the Defendant Martelly and Mr. Bellerive breached the Constitution, which constitutes a crime of high treason pursuant to Article 21 of the Constitution.

---

[4] Article 40.6 of the May 17, 2005 Decree referenced by Defendant Martelly and Bellerive in their Presidential Order reads as follows: The Minister also exercises regulatory authority with the express delegation thereof of the Prime Minister. Regulatory authority allows the Minister to make regulations to ensure the enforcement of legislation in the area of the Minister's responsibilities.

French version: Article 40.6.- Par délégation expresse du Premier Ministre, le Ministre exerce le pouvoir de réglementation. Le pouvoir réglementaire permet au Ministre de prendre des Règlements d'application destines à assurer l'exécution des lois relatives aux domaines d'attributions du Ministère.

Defendant Martelly and Bellerive corrupted Article 40.6 to suit their illegal Presidential Order by claiming that the Minister alone may fix telecommunication tariff through enactment of regulatory measures. Ministers, like the Prime Minister, may only execute the law, not make them. By adding US$0.05 per minute on telephone calls, Defendant Martelly, former Prime Minister Bellerive, and Jacques Gabriel, Minister of Public Works, Transportation, and Communications violated the Constitution and the laws of the country.

[5] Article 111 reads: The Legislature takes the laws on all matters of public interest.

30. Moreover, Defendant Martelly, who took an oath to respect the laws of the Republic, broke that oath by having Charles Castel, former governor of the Central Bank (BRH) executed the Circulars, which formed the basis for collecting the US$1.50.

31. Article 9 of the Law of August 17, 1979 Creating the Banque de la République d'Haiti (hereinafter "BRH"), empowers the Governor of the bank to perform only three tasks: 1) To appear on behalf of the bank in all legal matters, whether as plaintiff or defendant; 2) to summon the board of directors to meetings and to set the meetings' agendas; and 3) to sign all contracts and treaties on behalf of the bank. Nowhere in the law is the Governor authorized to sign Circulars.

32. The Presidential Order and Circulars were issued with the sole intent and purpose to tax the general public on commercial activities, i.e. money transfers/remittances and telephone calls; Defendant Martelly violated Article 218 of the Haitian Constitution, which states unequivocally that "[n]o tax in favor of the State may be established except by a law."

33. Defendants Privert and Moise, by maintaining the status quo, also breached the Constitution and administrative laws as well as all the laws that Defendant Martelly violated.

34. Since they committed crimes of high treason, there is only one institution that can exercise jurisdiction over the matter and that is the High Court of Justice (hereinafter "HCJ") established under Article 185 of the Constitution.[6]

---

[6] Article 185 reads: The Senate may constitute itself as a High Court of Justice. the proceedings of this Court are presided over by the President of the Senate, assisted by the President and Vice President of the Supreme Court as Vice President and Secretary, respectively, except where the Justices of the Supreme Court and officers of the public Prosecutor's Office assigned to that court are involved in the accusation, in which case, the Senators, one of whom shall be designated by the accused, and the Senators so appointed shall not be entitled to vote.

35. While Article 185 established the HCJ, Article 186 details the necessary procedure to indict Presidents, Prime Ministers, Ministers, and other high-ranking officials.

36. Since the ratification of the Constitution in 1987, the senate has never constituted itself as HCJ despite numerous accusations brought by citizens for violation of the Constitution and other laws of the Republic by former President Aristide, the late Préval, Martelly, Privert, and Moise.

37. After the publication in January 2019 of a report implicating Defendant Martelly, Privert, and Moise, a group of Deputies attempted to commence proceeding to indict them. The matter was brought before the president of the Chamber of Deputies, Gary Bodeau, who declined to commence proceeding against the accused because of his affiliation with them.[7]

38. Instead of initiating indictment proceeding, Mr. Bodeau decided to publish a list of names of 72 Deputies who allegedly met in secret to discuss ending their terms to allow the executive to declare the Parliament dysfunctional and put in place the government of their choice.

39. I relay the above information to facilitate the understanding that the HCJ is likely to never come to pass and short of an indictment and judgment against the accused by the HCJ, the Plaintiffs cannot bring their claims in either an ordinary court or "specialty courts."

40. Pursuant to Article 189-2, a condition precedent to Plaintiffs filing a civil suit against the named Defendants in Haiti is that a conviction must be had. Note that this requirement is

---

[7] The names of the 14 Deputies who requested the Chamber of Deputies to commence indictment proceeding are: Joseph Manès Louis (Cabaret-West); Sinal Bertrand (Port-Salut-Deep South), Roger Milien (1st Western District of Port-au-Prince); Déus Déronneth (Marigot, South East); Pierre Féguère Julien (Arcahaie, West); Abel Descollines (Mirebalais, Central Plateau); Bélizaire Printemps (3rd Western District of Port-au-Prince); Vikerson Garnier (Thiotte, South East) Frank Luture (Cayes-Jacmel, South East); Renald Exantus (L'Estère, Department of Artibonite); Jean Marcel Lumérant (Grand-Goâve, West); Romial Smith (Saut d'Eau, Lower Central Plateau); Jean Robert Bossé (Aquin, South); and Ketel Jean-Philippe (Jacmel, South East).

8

        in keeping with the ordinary traditional justice system. Since Mr. Salès invoked the various articles of the Criminal Code that the Defendants violated, Plaintiffs would have to wait until a guilty verdict is rendered by the ordinary court before they can make claims for damages or continue with their civil suit. *See* Salès' Decl. ¶ 42.

41. The HCJ, under Article 189-1, may not sentence the convicted defendant with anything more than "dismissal, disqualification or deprivation to exercise any public office for no less than five (5) years and no more than fifteen (15) years."[8] Therefore, Plaintiffs must rely on an event that will never occur to file suit in an ordinary court in Haiti.

**"Specialty Courts"**

42. There are no specialty courts in Haiti. *See* Salès Decl. ¶ 18.  Article 173-2 reads: No court and no jurisdiction in disputed matters may be established except by law. No special court may be established under any name what so ever.

43. The Defendants have allegedly committed crimes of high treason, as such only the HCJ may adjudicate the matters upon indictment by 2/3 of the Chamber of Deputies; and short of a conviction by the HCJ, just like in the ordinary process, the Plaintiffs are barred from bringing their civil claims.

44. The Moving Defendants referred to the Superior Court of Auditors and Administrative Disputes (Cour Supérieure des Comptes et du Contentieux Administratif- hereinafter "CSCCA") as a specialty court. *See* Salès Decl. ¶ 18.

45. The CSCCA is not a specialty court. It is a court created under Article 200 of the Constitution. It is empowered under Article 200-1 to "hear[] cases against the State and the

---

[8] Article 189-1 reads: The Court may not impose any other penalties than dismissal, disqualification or deprivation of the right to exercise any public office for no less than five (5) years and no more than fifteen (15) years.

9

territorial divisions, the Administration and Government officials, public services and citizens."[9]

46. Therefore, the CSCCA, as Mr. Salès asserted in paragraph 35 of his declaration, would have jurisdiction to adjudicate the Plaintiffs' civil claims but only after a conviction is handed down by the HCJ pursuant to Article 189-2 of the Constitution.

47. The Plaintiffs claim that the collection of fees are predicated upon two administrative acts, a Presidential Order and two Circulars, therefore, the CSCCA would indeed be the proper court to hear the dispute. However, because the Plaintiffs question the constitutionality of the administrative acts (Presidential Order and two Circulars), even with a conviction, based on the CSCCA's precedent the Plaintiffs would still have to wait a determination from the Constitutional Council created by Article 190-bis of the Constitution.[10]

48. The Constitution Council is an organ theoretically created by the Constitution to establish the constitutionality of laws enacted by the Parliament. I say theoretically because it exists only on paper. Since the ratification of the constitution in 1987, no administration finds it necessary to actually create the Constitutional Council.

49. As stated above, the CSCCA would not exercise jurisdiction over the Plaintiffs until the Constitutional Council determines the lawfulness of the acts at issue.

50. I arrive at the conclusion that the CSCCA would refrain from exercising jurisdiction in light of their own established precedent.

**The Case of Roosevelt Bellevue-Former Minister of Labor and Social Welfare**

---

[9] Article 200-1 reads: The Superior Court of Auditors and Administrative Disputes hears cases against the State and the territorial divisions, the Administration and Government officials, public services and citizens.

[10] Article 190-bis reads: The Constitutional Council is an organ charged to assure the constitutionality of the laws. It is the judge of the constitutionality of the law, of the regulations and of the administrative acts of the Executive Power. Its decisions are not susceptible to any recourse.

51. Mr. Bellevue was accused of embezzling hundreds of thousands of dollars through a scheme of over-billing for school supplies. The CSCCA investigated the matter and found out that Mr. Bellevue did commit the infraction accused of. The CSCCA found that Mr. Bellevue did engage in embezzling funds and as such, he is not susceptible to immunity and should be tried for wrong doing. The CSCCA referred the matter to the "proper authorities" for further actions.

52. Mr. Bellevue, instead of being charged and tried for high treason as defined by Article 21 of the Haitian Constitution, was rewarded with the post of head of mission to the World Trade Organization.[11]

**The Case of Jovenel Moise-Current President of Haiti**

53. In January of 2019, the CSCCA published a preliminary report in which it reveals that Defendant Jovenel Moise embezzled funds belonging to the people of Haiti. Despite such a report, Defendant Moise remains head of the nation and has not been indicted as required by Article 186 of the Constitution.

54. As recent as of May 31, 2019, the CSCCA published its final report and this time Defendants, Michel Joseph Martelly, Jocerlerme Privert, and Jovenel Moise are all found to have embezzled public funds totally 4.2 billion dollars; yet none of the accused have been indicted for treason nor is there any civil action pending against any one of them.

---

11. Mr. Bellevue, in his defense, claimed that the findings and publication were an attempt to assassinate his political character. Mr. Bellevue further declared that the amount charged was agreed upon by all members of the government sitting at the council of Ministers presiding by none other than Defendant Jovenel Moise. Mr. Bellevue further claimed he merely followed the previous administrations' directives. Therefore, Defendant Martelly, Defendant Privert and Defendant Moise were all involved in embezzling funds that they collected to provide free education to the children of Haiti. Hence, lies the reason Mr. Bellevue was rewarded with the job of heading the mission to the World Trade Organization.

11

55. A peaceful march to demand the removal and trial of Defendant Jovenel Moise and all others implicated in the theft of the funds was held for June 9 and 10, 2019. Subsequent there to, the people vowed to use violence to remove Defendant Jovenel Moise.[12]

**Haitian Civil Procedure and Jurisdiction**

56. As per Article 185 of the Constitution, only the High Court of Justice, which is the senate, may sit in judgment of high-ranking officials accused of committing crimes of high treason as defined by Article 21 once an indictment from the lower chamber is secured.

57. Nevertheless, as stated, neither the ordinary courts nor the CSCCA can exercise jurisdiction over the Plaintiffs' claims.

58. Moreover, the CSCCA does not have the authority to issue injunctive relief against the Government of Haiti as the Moving Defendants claimed. See Salès Decl.¶26.

59. A case in point is the Petition for Injunctive Relief for the Plaintiffs of Pelerin 5 and on behalf of all others similarly situated filed by Bureau des Avocats Internationaux (BAI) and the Institute for Justice & Democracy in Haiti (IJDH) in July of 2018 with the Inter-American Commission on Human Rights.[13] According to the moving papers filed on behalf of the seven (7) victims and other Class Members, the administration of Moise ordered the destruction of seven (7) homes located near his private residence in Pelerin 5. They further ordered the forceful expulsion and destruction of several families' homes within the vicinity of Defendant Moise's home because they were too close.

---

[12] On June 9, 2019, the people of Haiti did take on the streets in all four corners of the country to demand the resignation of Defendant Jovenel Moise together with all actors who participated in stealing the country's funds. Though the people were protesting peacefully, the administration ordered men with guns to open fire on the crowd.
[13] The Inter-American Commission on Human Rights (IACHR) is an independent branch of the Organization of American States (OAS). Its authority to adjudicate cases is found in the OAS Charter and the American Convention on Human Rights.

60. The BAI and the IJDH petitioned the Inter-American Commission on Human Rights without exhausting domestic legal remedies or addressing their clients' grievances with the CSCCA because the CSCCA does not have the authority to issue injunctive relief nor can it awards substantial damages as Moving Defendants declared. *See* Salès Decl.¶¶26,40.

**Collecting and Presenting Evidence, Including Witness Testimony, in Haitian Civil Courts**

61. The language found in Circular 98 under the captions **Déclaration des transferts internationaux/Reporting of International Transfers and Fiabilité de l'information/Reliability of the Information** clearly established that needed evidence are already in the United States**.**

62. Reporting of international transfers reads:

    All commercial banks, saving and mortgage banks, and transfer agencies must file paper report with BRH every Monday detailing the total number of transfers effectuated to and from Haiti, irrespective of how the beneficiary receives such transfer (in kind or cash), in keeping with the attached reporting form. These institutions are also obligated to file monthly with BRH a certified copy of the total amounts filed with the regulatory body of the territories where they are licensed to operate as Money Transfer Operators.
    Any institution that fails to adhere to the present requirements will be subjected to the following penalties:

63. Reliability of the information reads:

    At all times, the amounts reported in the attached form must mirror the amounts that appear in the relevant institutions books and the reports filed with the aforementioned regulatory bodies. If the amounts reported do not match, the BRH may, after investigating the nature and the circumstances of the violation, impose a penalty equivalent to 50% of the difference between the declared amounts and the amounts appearing in the books, in addition to the user fees due and owing by the violating institution.
    For all subsequent violation, the BRH may apply sanction that includes revocation of the operating permit or license.

64. The language of the sections quoted above shows that not only do the documents relating to the amount collected and reported are already in the United States, it also shows the likelihood of obtaining viable evidence in Haiti is utterly impractical. BRH does not require electronic filing of reported amount filed with foreign countries where the money operators are licensed to operate. Instead, BRH provides them with a paper form that they must use to record the same information filed with the authorities in the United States and elsewhere.

65. Haiti is a place where forgery is the order of the day. Documents not stored electronically are often missing and/or doctored to suit the receiver's needs. To prove this point, I read the report that the Government of Haiti published after the commence of this lawsuit, and the figures alleged to have received from the money transfer operators contradict both Defendant Martelly's account as well as Digicel's. The Government's report does not even amount to ten (10%) percent of what Defendant Martelly and Digicel reported.

66. Plaintiffs would undoubtedly be at a disadvantage as far as collecting evidence in Haiti because the requested documents are likely not in existence, and if they are, they are likely doctored. They would be of no use to the Plaintiffs.

67. As to the Haitian courts' ability to compel witnesses, Articles 198-199 of the Code of Civil Procedure do not provide for compulsory appearance. The language found in article 199 simply states that the judge may issue an arrest warrant, but it does not say the circumstances under which the judge may do so. Under article 198, a witness who failed to appear is only subjected to a fine of not less than five (Gdes 5-the equivalent of less than a US penny) and not more than twenty-five (Gdes 25-roughly US$0.26) gourdes. This

code is almost two centuries old yet remains unchanged; an indication of the stagnation of the system.

68. The Moving Defendants are all willing to submit to Haitian courts' jurisdiction because they know fully well that the courts do not have jurisdiction as detailed above; and further, because if they fail to appear as ordered they will simply pay the pittance that the 1826 law requires. The Moving Defendants own the justice system of Haiti.

69. An article titled "A Billionaire Lends Haiti a Hand" written by Stephanie Strom and published by the New York Times on January 6, 2012 speaks volume about the patronage and corruption and why the Moving Defendants are so willing to submit to the jurisdiction of kangourou courts.[14]

70. Given the facts as alleged in Plaintiffs' SAC, mere recitation of the Civil Code and Code of Civil Procedure cannot be the basis substantiating the Moving Defendants argument that Haiti is the best suited forum for this matter; nor can it support the Moving Defendants' act-of-state argument.

**The Allegations in the Second Amended Complaint Can Not Be Litigated Under Haitian Law**

71. Plaintiffs cannot pursue their claims in Haiti because the ordinary courts in Haiti do not have jurisdiction over the matter. Therefore, it is futile to entertain the Moving Defendants' assertion that the "[Plaintiffs] could sue for a variety of monetary damages, restitution, and/or reimbursement of funds transferred. Under Haitian law, there are no caps on the monetary value of these types of damages." Salès Decl. ¶ 40.

---

[14] The New York Time Article can be accessed at https://www.nytimes.com/2012/01/07/business/digicels-denis-obrien-helps-rebuild-haiti.html. Last visited June 8, 2019.

72. The assertion that "Plaintiffs also have the ability to bring their claims in the form of a collective proceeding against the Defendants in Haiti, in which the plaintiffs are identified and joined together in one litigation" is misleading. Salès Decl. ¶ 41.

73. Haitian's jurisprudence does not support class action. Unlike the mechanism put in place in the United States whereby the class members can opt in and out at will, Haitian laws require one to seek out all aggrieved parties and seek their authorization to file claims on their behalf.

74. The Haitian system places the burden on the person who seeks to bring suit to identify all aggrieved parties as opposed to compel the Defendants who control such information to disclose the list of names of all aggrieved parties. Notwithstanding, there is no provision in the Civil Code or the Code of Civil Procedure that allows multiple plaintiffs to file suit.

75. The Moving Defendants' claim that Haiti has laws or decrees prohibiting price fixing or render unfair competition a commercial violation is simply not true. Such laws do not exist. By citing "the Decree of May 17, 1995, which modified the Decree of February 13, 1964" does not address either issues. The Decree, as cited, is incomplete. Salès Decl. ¶ 42.

76. The Moving Defendants' assertion that "Haitian law does not provide for the execution of foreign judgments on Haitian soil" is also erroneous.

77. Under Article 15 of the November 30th, 1989 Relating to the Code of Investment, published in the Moniteur on Tuesday, November 26, 2002 under number 4, "Foreign and Haitian investors enjoy equal protection under the law. Court decisions and arbitration orders issued abroad are enforceable in Haiti, subject to the formalities provided by the Code of Civil Procedure and in the international agreements to which the Republic of Haiti is a party of."

## Haiti's Public Interest in this Dispute

78. As established by the Plaintiffs, the wrongdoing at the heart of Plaintiffs' claims did not take place in Haiti. The wrongful acts were committed in the United States. *See* Plaintiffs' SAC¶¶15-21,67-72,99-103,107,110-112,114,122,125-129,138,140,142,143,144,159-161.

79. Haiti's interest in this matter is minimal because the illegally collected fees do not affect Haitians because they are not the ones being charged the fees. The outcome of this case is vastly more important to the individuals who bear the burden of the fees and those individuals are citizens and residents of the United States. Even though the Presidential Order and Circulars are unlawful under Haitian law, the citizenry of Haiti have become accustomed to corruption and malfeasance by their heads of state and high-ranking officials that their only recourse is to demonstrate. Unfortunately, this is the norm in Haiti.

80. Based on the foregoing, Haiti's laws and legal system are not capable of entertaining this lawsuit and providing adequate remedy for Plaintiffs.

I declare under penalty of Perjury under the laws of the United States of America that, to the best of my knowledge, the foregoing is true and correct, and that I executed this declaration on June 10⁷, 2019 in Miami, Florida.

Pierre Max Antoine
Former Minister of Justice and Public Safety