UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

ODILON S. CELESTIN, WIDMIR ROMELIEN,
MARIE LUCIE ST VIL, GORETTIE ST VIL,
JEANNETTE VALEUS, GUETTY FELIN, HERVE
COHEN, and on behalf of all others similarly
situated,

Plaintiffs,

v.

MICHEL JOSEPH MARTELLY, JOCELERME
PRIVERT, JOVENEL MOISE, THE WESTERN
UNION COMPANY, D/B/A WESTERN UNION
HOLDINGS, INC, WESTERN UNION
FINANCIAL SERVICES, INC., AND THROUGH
OTHER SUBSIDIARIES AND AFFILIATES,
MONEYGRAM INTERNATIONAL, INC. AND
MONEYGRAM PAYMENT SYSTEM, INC.
(COLLECTIVELY MGI), CARIBBEAN AIR
MAIL, INC., D/B/A CAM, UNIBANK, S.A,
UNITRANSFER USA, INC., UNIGESTION
HOLDING, S.A., D/B/A DIGICEL HAITI,
NATCOM S.A., AND THE GOVERNMENT OF
HAITI,

Defendants.

**MEMORANDUM AND ORDER**

18-CV-7340 (LDH) (PK)

---

LaSHANN DeARCY HALL, United States District Judge:

Plaintiffs Odilon S. Celestin, Widmir Romelien, Marie Lucie St Vil, Gorettie St Vil,

Jeannette Valeus, Guetty Felin, and Herve Cohen (collectively, "Plaintiffs"), bring claims against

Defendants Michel Joseph Martelly, Jocelerme Privert, Jovenel Moise, the Government of the

Republic of Haiti, Western Union, Money Gram International, Inc, Caribbean Air Mail, Inc.,

Unitransfer USA Inc., Unigestion Holding d/b/a Digicel Haiti,, Unibank S.A., and Natcom S.A.

(collectively, "Defendants")[1] individually and on behalf of all others similarly situated, for

---

[1] Plaintiff Jeanette Valeus voluntarily dismissed her claims against Defendants The Western Union Company, d/b/a/
Western Union Holdings Inc. and Western Union Financial Services, Inc.  (*see* Notice of Voluntary Dismissal, ECF

violations of federal antitrust laws and various state laws.  Moving Defendants move pursuant to

Rules 8, 9(b), and 12(b)(6) of the Federal Rules of Civil Procedure, *forum non conveniens*, and

the act of state doctrine to dismiss the complaint in its entirety.

## BACKGROUND[2]

Plaintiffs allege that in April 2011, Michel Joseph Martelly, the then-President-elect of

Haiti, devised a "wide-ranging scheme" to impose fees and fix prices on money transfers, food

remittances, and international calls made to and from Haiti. (Third Am. Compl. ("TAC") ¶¶ 3–4,

72, 188, 238, ECF No. 118.)  While Martelly is alleged to be the "principal architect and

ringleader" of the conspiracy, Jocelerme Privert and Jovenel Moise, who each succeeded

Martelly, "adopted as his own the acts and conducts of his predecessor" and continued in

perpetrating the scheme.  (*Id.* ¶¶ 188, 214, 223.)

The scheme allegedly began before Martelly took the presidential oath. (*Id.* ¶ 189.)

According to the complaint, Martelly contacted telecommunication companies, including

Defendant Digicel Haiti, and requested that they add a $0.05 fee per minute on all phone calls

originating from the United States and Europe.  (*Id.*)  They agreed.  (*Id.*)  Martelly also met with

money transfer operators and commercial banks, including Defendants Caribbean Air Mail, Inc.,

Unibank S.A., Unitransfer USA Inc., Western Union, and MoneyGram International, Inc., to

---

No. 137.)   Plaintiffs Jeanette Valeus, Guetty Felin, and Herve Cohen voluntarily dismissed all claims against
Unitransfer USA Inc. and Unibank S.A. and all Plaintiffs dismissed claims arising under California law against
Defendants Unitransfer USA Inc., and Unibank S.A.  (Notice of Voluntary Dismissal, ECF No. 138.)  Plaintiffs
Odilon S. Celestin, Gorettie St Vil, Jeannette Valeus, Guetty Felin, and Herve Cohen voluntarily dismissed all
claims against Moneygram International Inc., and MoneyGram Payment System Inc. (Notice of Voluntary
Dismissal, ECF No.  139.)  Plaintiffs Widmir Romelien, Marie Lucie St Vil, Gorettie St Vil, Guetty Felin, and
Herve Cohen also dismissed claims against Defendant Caribbean Air Mail, Inc., d/b/a CAM.  (Notice of Voluntary
Dismissal ECF No. 142.)  Accordingly, Defendant MoneyGram International, Inc, and MoneyGram Payment
System, Inc, were terminated from the instant action.
[2] The following facts are taken from the third amended complaint and are assumed to be true for the purpose of this
memorandum and order.  The Court assumes the parties' familiarity with the facts of the case as set out in detail in
the Court's March 31, 2020 Memorandum and Order.  (ECF No. 73.)

strike an anticompetitive agreement to illegally raise the fee to remit money to Haiti by $1.50.
(*Id.* ¶ 192.)  Ultimately, Defendants each colluded with Martelly to draft three Haitian
governmental instruments to effectuate Martelly's scheme: two circulars issued by the Central
Bank of Haiti (the "BRH"), which together imposed a $1.50 fee on money transfers and food
remittances made to Haiti from the United States, Canada, Turks and Caicos, and the Bahamas;
and a presidential order, which mandated a $0.05 per-minute fee be added to the cost of
international phone calls made into Haiti (together, the "Fees").  (*Id.* ¶¶ 56, 66, 68, 71–72, 198.)

The first circular, known as Circular 98, was issued on May 20, 2011, and imposed
"testing, certification, user and inspection fees" of $1.50 on money transfers into and out of
Haiti.  (*Id.* ¶ 66.)  In particular, under Circular 98, money transfer operators must: (1) make
monthly filings with the BRH of certified copies of reports detailing the total amounts filed with
the regulatory body of the territories where they are licensed to operate; and (2) collect a $1.50
fee on money transfers and food remittances.  (*Id.* ¶¶ 67–68.)  The second circular, Circular 7,
was issued on May 31, 2011.  (*See id.* ¶ 113.)  According to the complaint, Circular 7 was issued
to address a term omitted from Circular 98.  (*Id.* ¶¶ 69–70, 113.)  Specifically, Circular 7
provides that "[t]he fees will be collected at the source from all money transfer [sic] sent and
received (cash or in kind) from overseas" and are to be collected from individuals in the United
States, Canada, Turks and Caicos, and the Bahamas.  (*See id.* ¶¶ 70–71.)  On September 14,
2011, Martelly issued the Presidential Order, which provides that "the floor price for all
incoming international call[s] is hence forth fixed at US $0.23 per minute."  (*Id.* ¶¶ 59–60.)  The
Presidential Order further requires that $0.05 of the $0.23 are to be turned over to CONATEL,
Haiti's telecommunication regulatory agency.  (*Id.* ¶ 61.)  According to Article 3 of the

Presidential Order, the purpose of the $0.05 fee is to help CONATEL fight against telephone fraud.  (*Id.* ¶ 62.)

Plaintiffs claim that Circulars 98 and 7 (together, the "Circulars") and the Presidential Order "ran afoul of the laws of Haiti" because "only the parliament may raise taxes and fees for the benefit of the state." (*Id.* ¶ 57 n.6.)  Furthermore, while Martelly "promoted, marketed, advertised and sold" the Fees to the public as necessary "to finance free education for impoverished children," Martelly knew that neither his Presidential Order nor the Circulars contain language "relating to tax or funding education." (*Id.* ¶¶ 58, 201–02.)  Defendants aided Martelly in misleading the public by advertising and collecting the Fees as lawful taxes levied to fund free education in Haiti.  *(Id.* ¶¶ 73, 96–98, 108–109, 119, 154, 167–168 177, 187, 207, 215, 225.)  According to the complaint, a program to fund free education in Haiti does not exist.  (*Id.* ¶ 221.)  Instead, Martelly allegedly embezzled monies collected through the Fees with the aid of Defendant Unibank S.A., which extended Martelly a $9 million loan to build a beach house as a means of transferring a portion of the proceeds from the $1.50 wire transfer fee.  (*Id.* ¶¶ 183–84.)  In return for their part in the scheme, Defendants allegedly retained a portion of the Fees.  (*Id.* ¶¶ 96, 116, 149, 164, 181, 212, 223, 226).  And while the Government of Haiti purports to receive at least an estimated $132 million per year from the Fees, (*id.* ¶ 197), there has been no public accounting detailing the amount of funds collected and remitted to the Haitian government nor an explanation of how the funds were used in Haiti once remitted to the BRH.  (*Id.* ¶¶ 84, 86, 117, 150, 165, 220.)

**DISCUSSION**[3]

I.  **Forum Non Conveniens**

The doctrine of *forum non conveniens* permits a federal court to "resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute." *Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 153 (2d Cir. 2005) (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507 (1947)).  It is a "remedy" granted to defendants who are victimized by a plaintiff's choice to "resort to a strategy of forcing the trial at a most inconvenient place for an adversary, even at some inconvenience to himself."  *Gilbert*, 330 U.S. at 507; *see also Koster v. (Am.) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 531–32 (1947) ("We hold only that a district court, in a derivative action, may refuse to exercise its jurisdiction when a defendant shows much harassment and plaintiff's response not only discloses so little countervailing benefit to himself in the choice of forum as it does here, but indicates such disadvantage as to support the inference that the forum he chose would not ordinarily be thought a suitable one to decide the controversy.").  Accordingly, "the central focus of the *forum non conveniens* inquiry is convenience" and "dismissal will ordinarily be appropriate where trial in the plaintiff's chosen forum imposes a heavy burden on the defendant or the court, and where the plaintiff is unable to offer any specific reasons of convenience supporting his choice." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 249 (1981).

A district court confronted with a motion to dismiss for *forum non conveniens* must engage in a three-step inquiry.  *First*, the Court must "determine the degree of deference properly accorded the plaintiff's choice of forum." *Celestin v. Caribbean Air Mail*, 30 F.4th 133, 145 (2d

---

[3] Plaintiffs withdraw without prejudice their California statutory claims, unjust enrichment claim, and Florida civil theft claim. (Pls.' Opp'n at 35, 37.) Plaintiffs concede that they failed to sufficiently plead their California statutory claims and that their unjust enrichment claim is duplicative. (Pls.' Opp'n at 35.) Plaintiffs also concede that they failed to plead a claim for civil theft under Florida law. (*Id.* at 37.)

Cir. 2022) (citing *Norex*, 416 F.3d at 153).  *Second*, the Court must "consider whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute."  *Id.*  *Third,* the Court must "balance the private and public interests implicated in the choice of forum."  *Id.*

### A. Degree of Deference to Plaintiffs' Choice of Forum

The Court's inquiry begins, as it must, with "a strong presumption in favor of the Plaintiff's choice of forum."  *Norex*, 416 F.3d at 154 (internal quotation marks omitted). Nevertheless, the degree of deference afforded to a plaintiff's choice of forum "moves on a sliding scale depending on several relevant considerations." *Iragorri v. United Tech. Corp.*, 274 F.3d 65, 71 (2d Cir. 2001).   Accordingly, when the plaintiff or the lawsuit has a "bona fide connection to the United States and the forum of choice and . . . considerations of convenience favor the conduct of the lawsuit in the United States" greater deference is afforded.  *See id.* at 72. But, when the plaintiff's choice of forum was dictated by forum-shopping, less deference is warranted.  *Id.*  The Court must consider the totality of the circumstances to determine whether a plaintiff's choice was borne out of convenience or some other improper purpose.  *Norex*, 416 F.3d at 155.  These circumstances include "(1) the convenience of the plaintiff's residence in relation to the chosen forum, (2) the availability of witnesses or evidence to the forum district, (3) the defendant's amenability to suit in the forum district, (4) the availability of appropriate legal assistance, and (5) other reasons relating to convenience or expense."  *Id.* (internal quotation marks omitted).  Forum-shopping considerations include "(1) attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case, (2) the habitual generosity of juries in the United States or in the forum district, (3) the plaintiff's popularity or the defendant's

unpopularity in the region, or (4) the inconvenience and expense to the defendant resulting from litigation in that forum." *Id.* (internal quotation marks omitted).

Against that backdrop, Defendants concede that Plaintiffs' choice of forum is entitled to some deference, but they argue that deference is "significantly diminished by other factors[.]" (Defs.' Mem. of L. Supp. Mot. to Dismiss ("Defs.' Mem.") at 9, ECF No. 148-1.)  Specifically, Defendants argue that Plaintiffs' putative representative capacity "markedly reduces the deference their choice of forum warrants."  (*Id.*)  The Court disagrees.

In its mandate, the Second Circuit noted that it "has left open the question whether the class action nature of a suit lessens the level of deference." *Celestin*, 30 F.4th at 146 n.17.  And, although Defendants assert that in *DiRienzo v. Phillip Services Corp.*, 294 F.3d 21 (2d Cir. 2002), the Second Circuit "explain[ed] that the Supreme Court in *Koster v. (American) Lubermens Mutual Casualty Co.*, [] 'gave less weight to the plaintiffs' choice of forum because they sued in a representative capacity,'" a closer review of both cases reveals that is inaccurate.[4] (Def's. Mem. at 10.)  In *DiRienzo*, the Court of Appeals stated that the district court "relying on *Koster* [], gave less weight to the plaintiffs' choice of forum because they sued in a representative capacity," and went on to vacate the portion of an earlier opinion disagreeing with that analysis.  *See* 294 F.3d at 28.  Therefore, it is incorrect to assert that the Second Circuit has

---

[4] Defendants also claim that the Second Circuit "similar[ly]" held in *In re Warrick* that a plaintiff's choice of forum is entitled to less deference when it represents a class, but that case concerned only whether a plaintiff's choice of venue "was entitled to substantial consideration" under a venue transfer analysis pursuant to 28 U.S.C. § 1404(a). *See* (Def's. Mem. at 10); 70 F.3d 736, 741 (2d Cir. 1995).  Of course, "the forum non conveniens doctrine is quite different from Section 1404(a)" and "is naturally subject to careful limitation for it not only denies the plaintiff the generally accorded privilege of bringing an action where he chooses, but makes it possible for him to lose out completely, through the running of the statute of limitations in the forum finally deemed appropriate." *Norwood v. Kirkpatrick*, 349 U.S. 29, 31 (1955).  Given the statute of limitations risks involved, the Court declines to read *In re Warrick* as applicable beyond the Section 1404 context without clear authority stating that it must.

decided the impact of putative class status on the level of deference to be afforded in a *forum non conveniens* analysis.

Because the cases on which Defendants rely for the proposition that putative class status diminishes deference to Plaintiffs' chosen forum are each reliant on *Koster*, a discussion of *Koster* is warranted.  In *Koster*, the Supreme Court was confronted with a derivative suit brought by a New York resident in the Eastern District of New York against Defendants located in Illinois.  *See* 330 U.S. at 519–522.  The suit involved only questions of state law and a corporation was the real party in interest.  *See id.*  In its analysis, the Supreme Court discussed the "complexities and unique features" of derivative suits "to see that its peculiar remedial process is no way abused."  *Id.* at 522.  In doing so, it noted that, unlike a dispute between two parties where "there is good reason why it should be tried in the plaintiff's home forum if that is his choice," a derivative suit involves "hundreds of potential plaintiffs, all equally entitled voluntarily to invest themselves with the corporations cause of action and all of whom could with equal show of right go into their many home courts."  *Id.* at 524.  In that circumstance, "the claim of any one plaintiff that a forum is appropriate merely because it is his home forum is considerably weakened."  *Id.*  Still, the Supreme Court maintained that "the ultimate inquiry is where trial will best serve the convenience of the parties and the ends of justice."  *Id.* at 527.  And, the Court ultimately affirmed dismissal of the action in New York only because "the plaintiff was utterly silent as to any reason of convenience to himself or to witnesses and as to any advantage to him in expense, speed of trial, or adequacy of remedy if the case were tried in [his chosen forum]."  *Id.* at 531.

Notably, *Koster* was decided prior to the enactment of the federal venue transfer statute— a time when *forum non conveniens* was applied domestically.  *See Atl. Marine Constr. Co. v.*

*U.S. Dist. Ct. for W. Dist. of Texas.*, 571 U.S. 49, 55, 60 (2013) (noting that 28 U.S.C. § 1404(a) is "a codification of the doctrine of *forum non conveniens* for the subset of cases in which the transferee forum is within the federal court system; in such cases, Congress has replaced the traditional remedy of outright dismissal with transfer.").[5]  The alternative forum in *Koster* was Illinois, where there were plaintiffs available to vindicate the rights of the corporation under Illinois law against Illinoisan defendants.  330 U.S. at 521.  In contrast, Plaintiffs here are American residents and citizens who have brought suit in their home country pursuant to federal and state law against Haitian defendants, and Plaintiffs are the real party in interest.  Moreover, as the Second Circuit noted in its mandate:  "Plaintiffs allege that the surplus fees at issue were charged within the United States, so the events giving rise to Plaintiffs' claims, as well as the parties, are clearly connected to the United States." *Celestin*, 30 F.4th at 147 n.17.  The Court discerns no reason to afford Plaintiffs' chosen forum less deference simply because they purport to represent a class of similarly situated individuals across the country, particularly when the alternative forum is a foreign country, not another state.

Resisting this conclusion, Defendants argue that Plaintiffs "constitute only a sliver of a purported national class, with 'a small direct interest . . . in which there are many potential plaintiffs . . . in many potential jurisdictions.'"  (Defs.' Mem. at 10.)  But, Defendants ignore that the class is defined as those who were charged in the United States by the money transfer operators or telecommunications companies.  In *Koster* and Defendants' other cases discussed more fully below, the alleged facts made clear that there were potential plaintiffs in the proposed forum who could bring suit.  That is not the case here, where the victims of Defendants' alleged antitrust conspiracy all reside outside Defendants' proposed forum.  Defendants argue further

---

[5] Dismissal, as opposed to transfer, meant that a plaintiff's suit could be subject to dismissal in the proper forum for statute of limitations reasons.

that the "claims in the TAC turn on events that occurred in Haiti, on evidence to be sought from witnesses and documents in Haiti, and on the laws of Haiti[.]"  (*Id.* at 10–11.)  But, this argument ignores that the TAC also allege events that occurred in the United States and that there will be evidence and witnesses in the United States as well.

In making their arguments, Defendants rely upon two cases that are premised upon *Koster* and decided by a single district court judge.  *See Gilstrap v. Radianz Ltd.*, 443 F. Supp. 2d 474 (S.D.N.Y. 2006) (Mukasey J.); *Deyoung v. Beddome*, 707 F. Supp. 132 (S.D.N.Y. 1989) (Mukasey J.).  Both cases, however, extend the authority upon which they rely without any explanation or basis for doing so.  In *Deyoung*, for example, the court stated that in *Koster*, "the Supreme Court held that a plaintiff's choice of forum weighs far less heavily in a case such as this where plaintiffs sue strictly in a representative or derivative capacity."  707 F. Supp. at 138.  As discussed above, however, *Koster* addressed only the unique context of derivative suits involving domestic parties, not class actions suits involving foreign defendants.[6]  Similarly, in *Gilstrap*, the court asserted that *DiRienzo*, supported the proposition that a plaintiff's "choice of forum is also entitled to less deference where . . . they are suing in a representative capacity."  443 F. Supp. 2d at 479.  But, on appeal of that decision, the Second Circuit clarified that it "has not definitively answered what effect a plaintiff's representative capacity has on his or her own choice of forum" and did not reach the question. *Gilstrap v. Radianz Ltd.*, 233 F. App'x 83, 85 (2d Cir. 2007).  For that reason alone, these cases have less persuasive value.

Moreover, in both cases, it is apparent that even if deference to the plaintiff's chosen forum were not diminished due to the class action nature of the suit, the complaints would

---

[6] Notably, the decision to dismiss the case rested upon comity grounds, not *forum non conveniens*.  *See DeYoung v. Deddome*, 707 F. Supp. 132, 137–38 (S.D.N.Y. 1989) ("Although in the interim the Canadian court's decision has altered the dispositive issue here to one of comity, principles of *forum non conveniens* would support the result here.")

nevertheless have been dismissed.  This is because in both cases it was apparent that convenience considerations pointed to the foreign forum.  Take *Deyoung*, for example.  There, the two plaintiffs were shareholders of a Canadian petroleum company who asserted that a proposed transaction through which an Indiana petroleum company would acquire a Canadian petroleum company was unfair to shareholders.  *See* 707 F. Supp. at 133.  Critically, "[f]our of the five defendants [were] domiciled in Canada"; the acts of the Canadian company's management took place in Canada; the agreement challenged was negotiated and signed in Canada; and the underlying documents were all located in Canada.  *See id.* at 138.  Indeed, the suit had no connection whatsoever to the Southern District of New York, where the suit was brought, other than the named plaintiffs.  *See id.*  It is apparent under an *Iragorri* analysis that even if Plaintifs' choice of forum was not afforded less deference, the private and public interest factors would have weighed in favor of dismissal because "the chosen forum [was] shown to be genuinely inconvenient and the selected forum significantly preferable."  *See* 274 F.3d at 74–75.  Similarly, in *Gilstrap*, the Second Circuit stated that "even were we to agree with plaintiffs that the district court should not, as a matter of law, have accorded less deference to their choice of forum, the other factors outlined by the district court in its decision weigh [] heavily in favor of dismissal on *forum non conveniens* grounds."  233 F. App'x at 85.  Accordingly, neither case provides sufficient support to hold as a matter of law that Plaintiffs' choice of forum is entitled to less deference simply because it is a class action suit.

This is not to say that class action status is not a consideration at all in the deference determination.  Indeed, in cases like *Gilstrap* and *DeYoung*, class action status may be relevant in the determination of conveniences.  The Court holds only that, in light of the dispute's clear

11

connection to Plaintiffs' chosen forum, there is no reason to afford diminished deference based solely upon the fact that Plaintiffs seek to represent a nationwide class of plaintiffs.

Next, Defendants argue that because "the relevant key facts took place in Haiti[,]" Plaintiffs' choice of forum warrants diminished deference. (Def's. Mem. at 11–12.) Specifically, Defendants assert that the "fundamental, dispositive questions in this case include (1) whether Haitian government officials and representatives of corporations doing business in Haiti conspired to illegally impose and administer the Fees"; [and (2)] how the fees were ultimately used in Haiti." (*Id.* at 10–11.) The Court disagrees. The Court construes this argument as being focused upon the "the availability of witnesses or evidence in the forum district." *See Norex*, 416 F.3d at 155. The relevant question, then, is whether the evidence and witnesses are more available in Plaintiffs' chosen forum than Defendants' preferred forum. *See id.* at 156 ("[T]he issue is not whether witnesses and evidence are unavailable in the defendant's preferred forum, but whether they are more available in plaintiff's chosen foreign forum than in its home forum."). The Court cannot say that the evidence is more or less available in the United State or Haiti because the TAC alleges conduct that occurred in both countries. Defendants ignore Plaintiffs allegations that five American corporations, each of which conducting business in New York, conspired with Haitian government officials to fix prices, and carried out that scheme in New York by charging Plaintiffs increased prices. Therefore, although there will certainly be evidence and witnesses located in Haiti, the same is true of the United States. Because evidence and witnesses will be located in both Haiti and the United States, the Court cannot accept Defendants' argument. Moreover, as detailed above, all of the Plaintiffs are either citizens or residents of the United States, and three of the Plaintiffs reside in the Eastern District of New York. Against these allegations, and those demonstrating that evidence and witnesses

are split between the two countries, Defendants are hard-pressed to assert that Plaintiffs' chosen forum was borne out of forum-shopping, which is the focus in a deference analysis. Accordingly, Plaintiffs' choice of forum "merits 'substantial deference' on any sliding-scale analysis." *Id.* at 156 (quoting *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 74 (2d Cir. 2003).[7]

Defendants' cases are not to the contrary. In *Wenzel v. Marriott International*, the Second Circuit affirmed the district court's determination that although the plaintiffs resided in their chosen forum, and one plaintiff received medical treatment in the chosen forum, the amount of deference was "limited by the fact that the lawsuit lacked a substantial connection to New York, as the alleged negligence and injury occurred in Aruba." 629 F. App'x 122, 124 (2d Cir. 2015). Defendants do not assert that Plaintiffs' lawsuit lacks a substantial connection to New York, nor could they. And, the fact that there might also be a substantial connection to another forum does not suggest that Plaintiffs' choice of forum was not borne out of convenience considerations.[8]

Accordingly, for the reasons set forth above, Plaintiffs' chosen forum is entitled to great deference. Still, that deference may be overcome "if the balance of conveniences suggests that trial in the chosen forum would be unnecessarily burdensome for the defendant or the court." *Iragorri*, 274 F.3d at 71.

## B. Adequate Alternative Forum

---

[7] Notably, Defendants make no assertion that Plaintiffs engaged in forum-shopping when they selected the Eastern District of New York.

[8] For the same reasons, Defendants' other cases are similarly distinguishable. *See Muraco v. Sandals Resorts International*, No. 14-CV-4896, 2015 WL 9462103, at *6 (E.D.N.Y. Dec. 28, 2015) (none of the operative facts occurred in plaintiff's chosen forum); *Bohn v. Bartels*, 620 F. Supp. 2d 418, 429, 434–35 (S.D.N.Y. 2007) (same); *Palacios v. The coca-Cola co.*, 757 F. Supp. 2d 347, 352–54, 363 (S.D.N.Y. 2010) (the court did not consider key operative facts at all in determining deference afforded to plaintiffs' choice of forum); *Martinez v. Goodyear Tire & Rubber Co.*, 2008 WL 11349944, at *4 (N.D. Tex. Jan. 31, 2008) (same).

At the second step of the *forum non conveniens* analysis, the Court must determine whether the proposed alternative forum is adequate.  *See Norex*, 416 F.3d at 157.  An alternative forum is adequate when "the defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute."  *Id.* (quoting *Pollux*, 329 F.3d at 75).  Of course, adequacy is not determined by consideration of "the existence of the identical cause of action in the other forum, nor [] identical remedies."  *Id.* at 158 (quoting *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d at 74.  Instead, the inquiry involves three questions:  (1) "Is the defendant amenable to process in the alternative forum"?; (2) is the plaintiff able to have his claims adjudicated fairly (*i.e.*, is the judiciary corrupt?); and (3) can the plaintiff litigate his claims safely and with peace of mind (*i.e.*, free from threats of violence and/or trauma connected with the particular claims)?"  *Base Metal Trading Ltd. v. Russian Aluminum*, 98 F. App'x 47, 49–50 (2d Cir. 2004).

Plaintiffs argue that the alternative forum is inadequate because they cannot litigate their claims safely or with peace of mind.  (Pls.' Mem. L. Opp. Defs.' Mot. to Dismiss ("Pls.' Opp'n") at 10, ECF No. 149.)  Specifically, Odilon Celestin, a named Plaintiff, submitted an affidavit detailing the violence he suffered in Haiti that led him to successfully seek asylum in the United States.  (*See* Decl. of Odilon Celestin ¶¶ 5–10, ECF No. 64-3.)  Celestin states that he knows that "the current administration [is] providing guns and all sort [sic] of logistical support to gangs to murder and rape their opponents," and he believes that "sending [him] and the Class Members (all United States citizens and residents) to have [their] rights vindicated in Haiti is equivalent to signing our death sentence."  (*Id.* ¶ 36.)  Plaintiffs also cite to a Human Rights Watch ("HRW") article dated July 22, 2022, titled "Haiti: Wave of Violence Deepens Crisis."  (Pls.' Opp'n at 10.)  In it, HRW notes that "[a] renewed wave of gang violence in Haiti has killed hundreds of people

in recent weeks[.]"  Specifically, "[a]ccording to the UN Integrated Office in Haiti, 540 people

were kidnapped and more than 780 were killed between January and May 2022."  These

statistics are concerning.  The Court's own research revealed the United States Department of

State has issued a Level Four Travel Advisory, advising citizens not to travel to Haiti "due to

kidnapping, crime, civil unrest, and poor health care infrastructure."  "Level Four" is the highest

available level, and it has been issued for countries like Iran, Russia, Ukraine, and North Korea.

*See* U.S. Dept. of State., *Haiti Travel Advisory*, https://travel.state.gov/content/travel/en

/international -travel/International-Travel-Country-Information-Pages/Haiti.html (July 27, 2023).

Tellingly, Defendants do not respond at all to Plaintiffs' arguments on this point.  Against that

backdrop, the Court agrees with Plaintiffs that Haiti, at this time, is not an adequate forum.[9]  *See*

*Guidi v. Inter-Cont'l Hotels corp.*, 224 F.3d 142, (2d Cir. 2000) (reversing dismissal based on

*forum non conveniens* where alternative forum was Egypt in part because plaintiffs "are strongly

adverse to litigating in a country where foreigners have been the target of hostile attacks, and

have concerns for their own safety if required to travel there to bring their suit"); *Rasoulzadeh v.*

*Associated Press*, 574 F. Supp. 854, 861 (S.D.N.Y. Oct. 31, 1983) (holding Iran to be an

inadequate forum in part because "if the plaintiffs returned to Iran to prosecute this claim, they

would probably be shot").[10]

---

[9] Although Defendants did not respond to Plaintiffs' violence arguments, the Court is aware that "considerations of comity preclude a court from adversely judging the quality of a foreign justice system absent a showing of inadequate procedural safeguards."  *Palacios v. The Coca-Cola Co.*, 757 F. Supp. 3d 347, 358 (S.D.N.Y. 2010) (quoting *PT United*, 138 F.4d at 73).  In *Palacios*, the plaintiffs argued that Guatemala was an inadequate forum based upon "recent incidents of violence, corruption, and judicial intimidation . . . as documented by the 2009 Guatemala Country Report issued by the United States Department of State."  *Id.* at 359.  The Court there found that showing insufficient because "conclusory State Department summaries are not dispositive of the adequacy inquiry." *Id.*  Critically, the court noted that "the statistics cited . . . reveal a significant *decrease* in the number of reported instances of threats or aggression toward judicial workers from the previous year."  *Id.* at 359 n.7.  This is very different from what is before the Court here, where violence has escalated through 2022, resulting in a Level Four travel advisory.  And, notably, there is no mention of a Level Four travel advisory in *Palacios*.

[10] Plaintiffs also argue that Haiti is an inadequate forum based on its purported lack of procedural safeguards or remedies.  (Pls.' Opp'n at 7–8.)  Specifically, they argue that "Haiti is one of the most corrupt countries in the

### C. Balancing of Private and Public Interests[11]

The final step of the *forum non conveniens* inquiry is for the Court to "balance the private and public interests implicated in the choice of forum." *Celestin*, 30 F.4th at 145.  Private interest factors include:  "[T]he relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Iragorri*, 274 F.3d at 73–74 (internal quotation marks omitted).  Public interest factors include administrative difficulties for busy courts; jury duty for people in a community who have no relation to the litigation; the interest in having localized controversies adjudicated locally; and issues attendant with adjudicating claims based upon foreign law.  *See id.* (internal quotation marks omitted.

Defendants argue that "Haiti has a substantial interest in determining the merits of Plaintiff's claims in its own courts, since those claims center on Haiti's government and institutions, as well as corporate entities doing business within Haiti."  (Defs.' Mem. at 14.)  Defendants concede that "members of the putative class allegedly live in the United States and paid the [f]ees in the United States," but assert that Plaintiff's central allegations "are that the Corporate Defendants conspired *with Haitian government officials* to impose [f]ees that were illegal *under Haitian law* . . . for the purported benefit of *Haitian citizens* but with the knowledge that the funds were being funneled for other purposes, including for the Corporate Defendants' own benefit and that of *Haitian government officials*."  (*Id.* at 14–15 (emphasis in original).)

---

western hemisphere, [and] its laws are mere written words with no effect because the executive branch totally controls the judiciary."  (*Id.* at 8.)  Although Plaintiffs support their assertions with a declaration drafted by Pierre Max Antoine, the Court declines to reach these arguments.  Specifically, the violence in Haiti, although unconnected to the litigation, is sufficient to hold that it is not an adequate forum at this time for Plaintiffs' to litigate their claims.

[11] Although the lack of an adequate alternative ends the inquiry, the Court continues its analysis in light of the Second Circuit's mandate.

The Court disagrees.  Plaintiffs' allegations are that the presidents of Haiti conspired with American companies to fix money transfer and telecommunications prices in the United States, and that Defendants representations to American citizens about those fees were false.  (*See* TAC.)  Stated differently, American Plaintiffs allege that five American companies, two Haitian companies, three Haitian presidents, and the Haitian government conspired to victimize American citizens in the United States.[12]  Defendants ignore all of this in their argument.  To be sure, Plaintiffs allege that the Haitian government harmed its citizens as well by not using the funds as stated.  But, this does not negate nor alter the allegations that the funds were taken out of American citizens' pockets in the United States.  This is not a case like *Carlstrom v. Livforsakring*, upon which Defendants rely, where the genesis of the dispute had no connection to the American forum, other than a single American plaintiff who chose to conduct business abroad, and the alleged misconduct, involving foreign actors, took place wholly abroad.  *See* No. 19-CV-11569, 2020 WL 7342753, at *5, *7 (S.D.N.Y. Dec. 14, 2020) (*forum non conveniens* motion granted where Swedish plaintiff alleged Swedish governmental agencies and large financial institutions participated in a scheme to defraud Swedish pensioners and Swedish citizens); *see also Palacios v. The Coca-Cola Co.*, 757 F. Supp. 2d 347, 350, 362–63 (S.D.N.Y. Nov. 19, 2010) (public interest factors weighed in favor of dismissal for *forum non conveniens* because the allegations by Guatemalan plaintiff concerning labor-related violence in American owned-subsidiary located in Guatemala).  Nor is this case like *Figuerido Ferras e Engenharia de Projecto Ltda. v. Republic of Peru*, which involved confirmation of an arbitration award in the United States, which if successful, would have required the Peruvian government to pay damages in excess of a cap set by Peruvian law.  665 F.3d 384 (2d Cir. 2011).  Indeed, there the

---

[12] To be sure, the TAC alleges that by keeping the collected fees for themselves, Haitian citizens

Second Circuit held that "[w]ith the underlying claim arising (1) from a contract executed in Peru (2) by a corporation then claiming to be a Peruvian domiciliary (3) against an entity that appears to be an instrumentality of the Peruvian government, (4) with respect to work to be done in Peru, the public factor of permitting Peru to apply its cap statute to the disbursement of governmental funds . . . tip the [*forum non conveniens*] balance decisively against the exercise of jurisdiction in the United States." *Id.* at 392.[13]

Defendants next argue that resolving Plaintiffs' claims in the United States would, for various reasons, "impose serious burdens on this Court." (Defs.' Mem. at 16.) *First*, Defendants assert that "to probe the accuracy of Plaintiffs' claims, the court would have to delve into questions relating to the operation of Haiti's government." (*Id.*) In support, Defendants cite to *Pollux*, but the issue there was not "questions relating to the operation" of a foreign government, but the interpretation of foreign law. *See, e.g.*, 329 F.3d at 76 (agreeing that "[g]iven that most of the relevant conduct occurred in England, English law would apply to the preponderance of plaintiffs' tort claims"). Defendants make no sincere argument that a choice-of-law analysis would result in application of Haitian law to Plaintiff's claims. And, any such argument would likely fail because, assuming there is a conflict between the states' fraud claims and Haiti's, a preliminary interest analysis reveals that New York common law would apply to the Plaintiff's common law claims, and the antitrust and various state statutes are applicable to Defendants' alleged conduct. New York's choice of law rules establish that when "conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally

---

[13] Defendants' reliance on *Hueter v. Kruse* is similarly misplaced. 610 F.Supp.3d 60 (D.D.C. June 18, 2022). Defendants are correct that the case was dismissed because the claims concerned "choices made by the American Somoa Government," but Defendants ignore the rest of the facts and analysis, which demonstrated that the forum "ha[d] no relationship with those choices . . . nor with the Government that made them." *Id.* at 71. That is not the case here where the alleged conspiracy directly impacted American citizens.

apply because that jurisdiction has the greatest interest in regulating behavior within its borders."
*See Cooney v. Osgood Machinery, Inc.*, 612 N.E.2d 277, 280 (N.Y. 1993).  When those interests
are equal, "the situs of the tort is appropriate as a 'tie breaker' because that is the only state with
which both parties have purposefully associated themselves in a significant way."  *Id.* at 281.
Here, although the alleged fraud may have been devised in Haiti, it is alleged to have been
carried out by United States corporations in New York and to have caused harm in New York.
Accordingly, there is a strong argument that New York law would apply because that is "the
place of injury."  *See id.*  Therefore, on the record before the Court, it is unlikely that the case
would involve much interpretation or application of Haitian law at all, which cuts against
dismissal for *forum non conveniens.*

      *Second*, Defendants assert that the lawsuit "will impose an unwarranted burden on the
New York-based jurors who would be required to serve for a lengthy trial (made lengthier by the
necessity of translating documents and testimony) and make factual findings as to events taking
place almost entirely in Haiti."  (Defs.' Mem. at 16.)  Of course, and as previously discussed,
Defendants ignore that the alleged events that took place "almost entirely in Haiti" led to
additional events taking place "almost entirely" in the United States and New York specifically.
Defendants rely upon *Osuna v. Citigroup Inc.*, but there the court determined that the case had a
substantial connection to a foreign country because under either parties' theory of the case, only
Mexico was implicated.  *See* No. 17-cv-1434, 2018 WL 6547205, at *11 (S.D.N.Y. Sept. 28,
2018) ("In Plaintiffs' telling, this suit concerns a campaign of defamation waged in part by a
Mexican bank (and its parent) against a Mexican citizen and the large Mexican oil services
enterprise he controlled, with the Mexican national oil company being a key source of evidence
[and] in [d]efendants' account, this case is about a massive fraud perpetrated by a large Mexican

oil services company in which a Mexican bank and the Mexican state oil enterprise were the principal victims."). Such is not the case here. Having considered all of Defendants' arguments, the public interest factors do not weigh heavily in favor of dismissal

The private interest factors do not weigh somewhat in favor of dismissal. As for ease of access to evidence, the Court agrees in part with Defendants' assertion that relevant documents will be located in Haiti. (*See* Defs. Mem. at 17.) Still, Defendants cannot deny that relevant documents will also be located in the United States. The Court also agrees that translation of documents will increase the cost of litigation. But this factor is not so relevant because that cost will be borne by the parties regardless of where the litigation takes place. (*See id.*) Travel costs is likewise not so relevant here because those costs will also be borne by the parties regardless of where the litigation takes place. The only factor that truly weighs in favor of dismissal is the ability subpoena witnesses. The Court agrees that Haitian non-party witnesses are likely not subject to service of process in the Eastern District of New York. *See In re Alcon S'holder Litig.*, 719 F. Supp. 2d at 276 ("[N]on-United-States-resident individual Defendants, unless subject to personal jurisdiction in the United States, would likely not be subject to compulsory process."). Indeed, the Court's subpoena power is limited to within 100 miles of where a person "resides, is employed, or regularly transacts business in person." *See* Fed. R. Civ. P. 45(c).

Taking the public and private interest factors together, Defendants' motion to dismiss for *forum non conveniens* is denied. Even assuming that Haiti is an adequate forum, Plaintiffs' chosen forum is due substantial deference given the demonstrated bona fide connections to the United States, and the public and private interest factors do not weigh heavily in favor of dismissal.

## II.     Failure to State a Claim[14]

To withstand a Rule 12(b)(6) motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when the alleged facts allow the court to draw a "reasonable inference" of defendants' liability for the alleged misconduct.  *Id*.  While this standard requires more than a "sheer possibility" of defendants' liability, *id*., "[i]t is not the Court's function to weigh the evidence that might be presented at trial" on a motion to dismiss.  *Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 565 (E.D.N.Y. 1999).  Instead, "the Court must merely determine whether the complaint itself is legally sufficient, and, in doing so, it is well settled that the Court must accept the factual allegations of the complaint as true."  *Id*. (citations omitted).

Defendants argue that the complaint should be dismissed in its entirety because each of Plaintiffs claims suffer pleading deficiencies.  The Court addresses each in turn.

### A.  Sherman Act

Section 1 of the Sherman Act "bans every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States."  *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013).  Defendants argue that Plaintiffs have failed to plead an agreement by Defendants to fix prices.  (Defs'. Mem. at 19.)  The Court agrees.

---

[14] Although some Defendants have argued that the Court lacks personal jurisdiction over them, the Court may reach the merits of Plaintiffs claims without deciding the personal jurisdiction arguments because the Court has jurisdiction over at least five Defendants.  *See Chevron Corp. v. Naranjo*, 667 F.3d 246 n.17 (2d Cir. 2012) (reaching merits and declining to address personal jurisdiction arguments where court had jurisdiction over at least some of the defendants).

To plead an agreement, a plaintiff must "allege enough facts to support the inference that a conspiracy actually existed." *Mayor*, 709 F.3d at 136.  This may be done by alleging "direct evidence that the defendants entered into an agreement" or "circumstantial facts supporting the inference that a conspiracy existed." *Id.*  Direct evidence "is 'evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted' and may include 'a document or conversation explicitly manifesting the existence of the agreement in question.'" (quoting *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 324 n.23 (2d Cir. 2010). Circumstantial evidence typically involves allegations of "conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors." *Mayor*, 709 F.3d at 136 (quoting *Todd v. Exonn Corp.*, 275 F.3d 191, 198 (2d Cir. 2001)).  Here, Plaintiffs disclaim all reliance on circumstantial evidence, asserting that they "need not allege circumstantial evidence or parallel conduct and plus factor[s] because they asserted 'direct evidence.'"  (Pls.' Opp'n at 24.)  Accordingly, the Court focuses on Plaintiffs' purported direct evidence.

Plaintiffs, in two paragraphs largely comprised of case citations, argue that two video exhibits and Circulars 7 and 98 "are the types of smoking gun evidence that established beyond reason the explicit conclusion that the parties conspired to enter into a price-fixing agreement; thus obviating the need to draw inferences."  (Pls.' Opp'n at 23–24.)  They say nothing more.  As Defendants rightly point out, these four pieces of evidence require the Court to draw many unreasonable inferences to conclude that an agreement existed.  Take Exhibit A, for example, a video-recording of a news conference that occurred on an unspecified date at an unspecified location with Denis O'Brien, then-CEO of Digicel and Martelly.  (Decl. Marcel Denis, Ex. A, ECF No. 65-1.)  In the video, O'Brien describes meeting with Martelly and other mobile phone

companies shortly before Martelly's inauguration.  According to O'Brien, at the meeting, Martelly informed the phone companies that he wanted to create a "new tax" on inbound calls that would be collected by the phone companies in Haiti.  The revenue from the tax, according to O'Brien, would be used to fund education.  O'Brien states that the phone companies agreed immediately.  In addition, Martelly describes adding the $1.50 fee on money transfers, which would also be used to fund education.  The video establishes only that, Martelly met with one other Defendant, Digicel to discuss the imposition of a tax on incoming phone calls.  Nothing in the video suggests that, contrary to what Martelly and O'Brien reported, Defendants devised a plan to fix prices.  Further, even if it did, the video does not implicate any Defendant other than Digicel.  Accordingly, the Court would need to infer not only that O'Brien and Martelly are lying in the video, but also that every Defendant named by Plaintiffs was in attendance and that every Defendant agreed to fix prices.  There is not a single allegation in the TAC that allows the Court to draw these inferences.

Exhibit B is no more helpful.  (Decl. Marcel Denis, Ex. B, ECF No. 145-6.)  The Exhibit is a transcript of another video-recording of a news conference that occurred on an unspecified date at an unspecified location, in which Martelly describes his tax plan.  In the video, Martelly states that he intended to collect "0.05 per minute on all incoming phone calls . . . . from people abroad who are calling Haiti[]" in order to "generate 3.5 million dollars every month for education." (*Id.*)  And, he states that he intended to collect one dollar on every money transfer to be deposited into the education fund account.  Critically, there is no discussion of price-fixing in the video.  And, not one of the Defendants is referenced.  The circulars likewise make no reference to price-fixing or any of the defendants.  To be sure, Circular 98 references two

"meetings," but there is no indication that any of the Defendants attended those meetings or what was discussed in those meetings.

In sum, Plaintiffs' "direct evidence" is far from direct. The evidence establishes at most that on three separate occasions Martelly, then-president of Haiti, met with unspecified individuals to discuss the imposition of a tax or fee on phone calls and money transfers into Haiti. Plaintiffs' provide no basis, other than their own speculation, to conclude that Defendants conspired to fix prices and that the taxes were a mechanism for doing so. To be sure, the TAC contains many allegations that various Defendants knew Martelly's true intentions. But, these allegations are based upon information and belief, and Plaintiffs provide no factual support whatsoever for their conclusions. Accordingly, in order to conclude based upon Plaintiffs' evidence that Defendants agreed to fix prices, the Court would have to infer an agreement out of whole cloth. This, the Court cannot do.

Plaintiffs cite a number of cases to support their argument that the news conferences and the circulars are sufficient, but none are helpful. Indeed, a review of the pincites shows that Plaintiffs rely only upon the statements of law establishing that direct evidence is sufficient to plead an antitrust conspiracy. This legal proposition is not in dispute. Moreover, in each case, the plaintiff relied upon circumstantial evidence, not direct evidence.[15]

---

[15] The Court notes that in addition to the $0.05, the Presidential Order establishes a price floor on incoming calls. This is suggestive of a conspiracy to fix prices. Nevertheless, Plaintiffs in their TAC and opposition brief focus entirely on the fees and say nothing about the price floor, so the Court focused its attention on the fees. However, even if Plaintiffs argued that the price floor established an agreement to fix prices, they would fail because, as explained above, Plaintiffs provide only speculation as to an agreement between Defendants.

Because Plaintiffs' direct evidence is insufficient to establish an agreement to fix prices in violation of the Sherman Act, and they have disclaimed reliance on circumstantial evidence, Plaintiffs' Sherman Act claim is dismissed.[16]

### B.   Fraud, Florida Deceptive and Unfair Trade Practices Act, and Conversion

Plaintiffs allege that each of the Defendants committed fraud in violation of common law established in New York, Florida, and California; a violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUPTA"); and conversion.  The parties agree that Plaintiffs' claims are subject to the heightened pleading standard set forth in Rule 9(b) of the Federal Rules of Civil Procedure.[17]

Rule 9(b) requires the any claim based upon fraud or mistake to "specify the time, place, speaker, and content of the alleged misrepresentations, explain how the misrepresentations were fraudulent and plead those events which give rise to a strong inference that the defendant had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth."  *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013) (internal quotation marks and citation omitted).  Moreover, "Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.'"  *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993).  To be sure, a plaintiff may base allegations upon information and belief when information is "peculiarly within the opposing party's knowledge."  *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987).  Nevertheless, any allegation based

---

[16] Plaintiffs also alleged violations of state antitrust law.  The parties agree that those state law claims rise and fall with the Sherman Act claim.  Accordingly, because the Sherman Act claim is dismissed, so too must the state antitrust claims.

[17] The Second Circuit has not decided whether common law fraud claims are subject to the strict requirements of Rule 9(b).  *See Olson v. Major League Baseball*, 29 F.4th 59, 76 n.9 (2d Cir. 2022) (noting that the Second Circuit has not decided whether Rule 9(b) applies to common law fraud claims (citing *SRM Glob. Master Fund Ltd. P'Ship v. Bear Stearns Cos.*, 829 F.3d 173, 177 n.4 (2d Cir. 2016)).  Neither party has argued whether the heightened notice pleading requirements are applicable, so the Court assumes without deciding that Rule 9(b) applies here.

upon information and belief must be "accompanied by a statement of facts upon which the belief is based." *Id.*

In support of their fraud, FDUPTA, and conversion claims, Plaintiffs, in a chart, identify four allegedly false statements that were made by various Defendants:

1. "$1.50 and $0.05 added to money transfer and telephone calls to Haiti are lawful taxes/fees imposed to raise revenue to fund free education."

2. "Taxes imposed to finance free education."

3. "For all transfers, Receivers may receive less due to foreign taxes."

4. "Recipient may receive less due to fees charged by recipient's bank and foreign taxes."

(Pls.' Opp'n at 29.) Plaintiffs assert that "Martelly, Unigestion, NATCOM, Western Union, [Moneygram], [Caribbean Air Mail], [and] Unibank" are the "speakers" of these statements, but they do not specify which speaker made each statement. (*Id.*) Plaintiffs also assert that the statements were made "[b]eginning in July 2011 and continuing to date, with the dates of each and every specific remittance receipts and phone calls made from the United States." (*Id.*) Finally, Plaintiffs assert the statements are fraudulent because "[t]here is no law calling for the collection of the $1.50 and $0.05, whether as a fee or tax to fund education[,]" "there is no free universal education program[,]" and "[r]ecipients receive remittance from 'local agents' not from banks." (*Id.*)

To plead a fraud claim under New York law, a plaintiff must allege "(1) a material, false representation; (2) an intent to defraud thereby; and (3) reasonable reliance on the representation; (4) causing damage to the plaintiff." *Knox v. Countrywide Bank*, 4 F. Supp. 3d 499, 509 (E.D.N.Y. 2014) (quoting *Chanayil v. Gulati*, 169 F.3d 168, 171 (2d Cir. 1999)).

Defendants argue that each of Plaintiffs' claims fail to satisfy Rule 9(b) in part because Plaintiffs fail to allege any material misrepresentation.  (Defs'. Mem. at 31.)  The Court agrees. At the outset, Defendants are correct that Plaintiffs have failed to allege the Corporate Defendants made any representations at all about the Fees.  (*Id.*)  Plaintiffs' identification of generic disclaimers like "recipient may receive less due to foreign taxes" is of no help because these statements say nothing about the lawfulness or the validity of the Fees.  (Pls'. Opp'n at 31.) Instead, these statements warn the sender that the receiver will receive less funds than were sent due to foreign taxes.  Even if the statements could be construed as claims that the Fees were lawful taxes, there still would be no misrepresentation.  A tax is "a charge . . . imposed by the government on persons, entities, transactions, or property to yield public revenue."  Blacks Law Dictionary (11th ed. 2019); *see also* Merriam-Webster (defining "tax" as "a charge usually of money imposed by authority on persons or property for public purposes").  Here, Martelly, then-president of Haiti, imposed charges on money transfers and phone calls to Haiti.  In other words, he imposed a tax.  Plaintiffs' assertion that Martelly lacked authority to impose the Fees does not, without concurrence by the Haitian government, change their nature as a tax, and their assertion certainly does not make the Fees unlawful.  Accordingly, to the extent that any Defendant represented that the Fees were lawful, Plaintiffs have failed to establish that the representation was false, so the fraud, FDUTPA, and conversion claims premised upon them must be dismissed.[18]

---

[18] In their reply, Defendants argue that act of state doctrine precludes claims based upon representations that the Fees were a lawful tax.  (Reply Mem. L. Supp. Mot. Dismiss ("Defs'. Reply") at 4, 10, ECF No. 154.)  It is well-settled that arguments cannot be raised for the first time in a reply brief, so the Court rejects this argument. Nevertheless, the argument is correct.  The Second Circuit explained that the act of state doctrine "is a 'rule of decision' for the merits:  It compels federal and state courts to treat foreign official acts as 'valid' in the sense that a court may not declare them 'null and void.'"  *Celestin v. Caribbean Air Mail*, 30 F.4th 133, 138 (2d Cir. 2022) (quoting *W.S. Kirkpatrick & Co. v. Env't Tectonics Corp. Int'l*, 493 U.S. 400, 406 (1990)).  Thus, "when applicable" the Court must "[f]irst . . . assume that a foreign state's official acts executed within that state's territory are valid in that they have the legal effects . . . that they purport to have" and "second, under that premise, the [C]ourt should

As for representations concerning the education plan, which are alleged to have been made only by Martelly and the CEO of Digicel, Defendants argue that the TAC lacks sufficient allegations establishing knowledge of falsity as to the Corporate Defendants. (Defs'. Mem. at 31-23.) The Court agrees. The TAC is devoid of any allegations that come close to establishing that any Corporate Defendant were aware that Martelly did not, and did not intend to, use the fees to finance free education. While the TAC alleges that O'Brien spoke on an unspecified date at an unspecified location about Martelly's plan to use the fees to pay for education, (TAC ¶¶ 76–77), nothing in the complaint supports the inference that he knew that the plans did not exist or otherwise would not be followed. To be sure, the TAC alleges that Mr. O'Brien participated in meetings prior to Martelly's inauguration at which Defendants devised a scheme to fix prices, but as previously discussed, Plaintiffs' allegations about what occurred at that meeting is pure speculation. (*Id.* ¶ 79.) The Court cannot conclude, based upon the allegations in the TAC, that any at Digicel knew that the education plans were false. As to the other Corporate Defendants, the TAC lacks any allegations establishing that any specific individual employed by, or otherwise represented, the Corporate Defendant knew that Martelly's plan was subterfuge. Indeed, the TAC does not identify any individual at any Corporate Defendant at all, other than Mr. O'Brien. Instead, the TAC alleges "upon information and belief" that Corporate Defendants knew the "real" plan. (*Id.* ¶ 107.) This allegation is insufficient because there are no facts supporting the inference that the allegation is well-founded. The Court cannot conclude that, to the extent any Corporate Defendant made any representation about plan to use the Fees to

---

evaluate the merits of the legal claim." Here, as Defendants point out, the presidential order and circulars are signed by Haitian government officials and "imbued . . . with formality," which is an indicator that a foreign sovereign's act is "official." *Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 58 (2d Cir. 2019). Assuming the validity of those documents—as the Court must—dooms any fraud claim premised upon representations consistent with those documents. That is, the representations that "[f]or all transfers, Receivers may receive less due to foreign taxes" and "[r]ecipient may receive less due to fees charged by recipient's bank and foreign taxes" are not false because the fees imposed are valid, and therefore those representations cannot serve as a basis for Plaintiffs' fraud claim.

pay for free education, that the Corporate Defendant knew the representation was false. Accordingly, the fraud, FDUPTA, and conversion claims against the Corporate Defendants premised upon representations about the education plan are dismissed.

As for the remaining claims for fraud, FDUPTA, and conversion against Martelly, Defendants correctly argue that Plaintiffs failed to sufficiently plead the elements of each. As for the fraud claim, Plaintiffs fail to sufficiently plead reliance. Specifically, there is no allegation in the complaint that Plaintiffs heard Martelly's representations about the education plan and paid the Fees as a result. *See Olson*, 447 F. Supp. 3d at 167 (dismissing fraud claim where plaintiffs failed to plead that they "saw, read, or otherwise noticed any of the . . . actionable misstatements"). Moreover, it is unclear how the education plan could be material in Plaintiffs' decision to send money or make phone calls to Haiti. There is no allegation suggesting that had Plaintiffs' known the plan was false that they would not send money or make calls to Haiti. Moreover, any allegation that Plaintiffs relied upon this representation or that the representation was material is belied by the fact that Plaintiffs continue to send money and make phone calls to Haiti despite their knowledge that the funds are being misused.

As for the FDUPTA claim, Plaintiffs failed to sufficiently allege a nexus between Martelly's representations and Florida. The FDUPTA "applies only to actions that occurred within the state of Florida." *Five for Entmn't S.A. v. Rodriguez*, 877 F. Supp. 2d 1321, 1330 (S.D. Fla. 2012) (citing *Millennium Commc'ns & Fulfillment, Inc. v. Office of Attorney Gen., Dep't of Legal Affairs, State of Fla.*, 761 So.2d 1256, 1262 (Fla. Dist. Ct. App. 2000)); *see also Karhu v. Vital Pharm., Inc.*, No. 13-60768, 2013 WL 4047016, at *10 (S.D. Fla. Aug. 9, 2013) ("[T]he court concludes that FDUTPA applies to non-Florida residents if the offending conduct took place predominantly or entirely in Florida."). Here, Plaintiffs do not allege that Martelly

engaged in any conduct whatsoever in Florida.  And the allegations concerning the representations Martelly made provide no detail about where or when those representations were made.  Accordingly, Plaintiffs' FDUPTA claim against Martelly must be dismissed.

As for the conversion claim, Defendants correctly argue that Plaintiffs fail to sufficiently allege a specific, identifiable fund.  *See Cruz v. TD Bank*, *N.A.*, 855 F. Supp. 2d 157, 174 (S.D.N.Y. 2012) (quoting *Republic of Haiti v. Duvalier*, 211 A.D.2d 379, 384 (1st Dep't 1995)).  As Plaintiffs acknowledge, "the money must be described or identified in the same manner as a chattel."  *SHLD, LLC v. Hall*, 2017 WL 1194240, at *4 (S.D.N.Y. Mar. 30, 2017) (quoting *Interior by Mussa, Ltd. v. Town of Huntington*, 174 Misc. 2d 308, 310 (2d Dep't 1997)), *report and recommendation adopted*, 2017 WL 1428864 (S.D.N.Y. Apr. 20, 2017).  But, the TAC does not specify this information at all.  Instead, it alleges only that Defendants must return the Fees, without any specification how much money each Plaintiff paid or where the money is located.  (TAC ¶¶ 289-93.)  This is insufficient to establish a claim for conversion.[19]

In sum, Plaintiffs' claims for fraud, violation of FDUTPA, and conversion are dismissed for failure to comply with Rule 9(b) and for failure to state a claim under which relief may be granted.

**C.  New York General Business Law §§ 349 and 350**

New York General Business Law ("GBL") Section 349 prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in New York.  N.Y. GBL § 349.  Section 350 prohibits "[f]alse advertising in the conduct of any

---

[19] The conversion claim against Martelly is also subject to dismissal due to the act of state doctrine.  Conversion requires proof that the defendant took "dominion over the property . . . in derogation of plaintiff's rights."  *Cruz*, 855 F. Supp. 2d at 174 (internal quotation marks omitted).  Here, Plaintiffs' allegations reveal that the Fees were charged for money transfers and phone calls that Plaintiffs freely made.  And, the Fees were imposed pursuant to a Haitian government act.  Accordingly, Plaintiffs have no right to the Fees.  To the extent Martelly took money from the Haitian government, it is the Haitian government, not Plaintiffs who would have a conversion claim.

business, trade or commerce or in the furnishing of any service." N.Y. GBL § 350.  To make out a claim under either law, a plaintiff must allege "(1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *Gristede's Foods Inc. v. Unkechauge Nation*, 532 F. Supp. 2d 439, 450 (S.D.N.Y. 2007) (quoting *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000)).  "Deceptive acts" are acts that are "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Id.*  Critically, "[c]ausation is an essential element" of GBL claims. *Belifiore v. Procter & Gamble Co.*, 94 F. Supp. 3d 440, 446 (E.D.N.Y. 2015) (internal quotation marks omitted).  Therefore, "each plaintiff must individually plead the disclosures he or she received were inadequate, misleading, or false, and that she was injured as a result of the insufficient or false disclosures." *Id.* (internal quotations marks omitted).  And, a plaintiff must "describe in detail the allegedly misleading and deceptive statements . . . upon which he relied in purchasing the product." *Id.* (internal quotation marks omitted).

Plaintiffs' GBL claims are premised upon the same conduct at issue in their fraud claims. Accordingly, to the extent that the claims rely upon a representation that the Fee is lawful, the claims must fail for the same reason as the fraud claim.  As for the representations concerning education, Defendants argue that Plaintiffs fail to allege a connection between the representations and Plaintiffs' individual circumstances.  (Defs.' Mem. at 34.)  The Court agrees. Plaintiffs allege generally that "Defendants utilized tactics that were and are deceptive and misleading in material respects, exposed the public to sales tactics through various mediums that were and are false and misleading in relevant respects and led to Plaintiffs' injury."  (TAC ¶ 251.)  But, nowhere in the TAC are these purported tactics described.  To be sure, as to Caribbean Air Mail, Moneygram, Western Union, Unibank, Unitransfer, there is some variation

of the allegation that the Defendant "through its actions or inactions, omissions and/or overt acts

and conduct . . . did mislead the public into thinking that" the Fees were a "lawful tax aimed at

funding free and compulsory education in Haiti when they knew it was not the case." (*See, e.g.*,

*id.* ¶¶ 119, 137, 154, 168, 187.)  Still, a review of other allegations in the TAC regarding these

Defendants reveals no marketing materials or other statements regarding the education plan.

Moreover, even if the TAC did specify what precisely these Defendants stated, the TAC would

be deficient because it lacks any detail whatsoever about which Plaintiff saw which

representation, and what each Plaintiff did as a result.  *See Wright v. Publishers Clearing House,

Inc.*, 372 F. Supp. 3d 61, 67 (E.D.N.Y. 2019) (dismissing GBL claims where complaint "fail[ed]

to identify the specific advertisements seen by each plaintiff"); *see also Abraham v. Am. Home

Mortg. Servicing, Inc.*, 947 F. Supp. 2d 222, 235 (E.D.N.Y. 2013) (dismissing GBL claim that

"contain[ed] only general allegations about disclosures to all [p]laintiffs and does not contain any

allegations about the specific disclosures [the individual plaintiff] did or did not receive").

Accordingly, Plaintiffs' GBL claims must be dismissed.[20]

Perhaps recognizing this deficiency, Plaintiffs in their opposition focus upon statements

made by O'Brien in a press conference held on an unspecified date at an unspecified location.

(*See* Pls.' Opp'n at 34.)  Read liberally, Plaintiffs' theory appears to be that because O'Brien and

Martelly stated in the press conference that the Fees would be used for education, and Corporate

Defendants' charged the Fees, the Defendants misled the public by collecting the fees.  But a

review of the TAC reveals no allegations establishing that any Plaintiff watched the press

conference, that the press conference was material to Plaintiffs' decision to send money and

---

[20] Because neither Martelly, Privert, Moise, nor the Government of Haiti are alleged to have made any
representations "in the conduct of any business, trade or commerce in New York," Plaintiffs' GBL claims against
them, to the extent they are raised, must be dismissed.  N.Y. GBL §§ 349-350.

make calls to Haiti, or that Plaintiffs sent money and made calls to Haiti in reliance on representations made at the press conference.  Moreover, even if these allegations were present, they would at most implicate Digicel concerning the phone Fee, not the money transfer Defendants.  O'Brien made no representations at all about the money transfer Fee, so Plaintiffs could not have relied upon O'Brien's statements when they paid the money transfer Fee. Finally, similar to the fraud claims, the Court is unsure as to how Plaintiffs could allege that they relied upon any representations concerning Fees' use given that disagreement with how the government-imposed Fees would be used very likely would not affect the decision to send money or make phone calls to family and thereby incur the Fee.  There is no allegation in the TAC that suggests Plaintiffs would have not sent money or made phone calls, and thereby avoid the Fees, had they known that the Fees would not be used to fund education.

Plaintiffs' rely heavily upon *Kuklachev v. Gelfman*, but that reliance is misplaced.  (Pls'. Mem. at 33-34.)  In *Kuklachev,* plaintiffs alleged that the defendants had misled the public by copying plaintiffs' performances and promotional materials.  600 F. Supp. 2d 437, 464 (E.D.N.Y. 2009).  Critically, the plaintiffs in *Kuklachev* established that the public saw defendant's fake shows and promotional materials by alleging that "dissatisfied audience members demanded their money back" from plaintiffs.  *Id.* at 476.  Setting aside the vastly dissimilar factual circumstances and allegations, this case does not support Plaintiffs because the plaintiffs there established a connection between the deception and themselves.  Here, there are no allegations establishing that Plaintiffs saw any deceptions concerning the education plan, nor are there allegations that the representations were material to Plaintiffs and that they acted in reliance on those representations.

Because Plaintiffs failed to allege that Plaintiffs saw representations from Defendants concerning the education plan prior to incurring the Fees or that they relied upon those representations prior to sending money or calling Haiti, Plaintiffs' GBL claims must be dismissed.

### D. Communications Act

Plaintiffs allege that Unigestion and NATCOM violated the Communications Act by "discriminat[ing] against Plaintiffs and other Class Members in that they made an unjust and unreasonable discrimination in charging a class of people making phone calls to Haiti in violation of 47 U.S.C. § 206."  (TAC ¶ 365.)  Plaintiffs allege further that Unigestion and NATCOM discriminated "by giving an undue, unreasonable preference and advantage to Defendant Martelly and cohorts, while subjecting Plaintiffs and other Class Members to undue, unreasonable prejudice, and disadvantage with the illegally raised US $0.05 per minute on international calls to Haiti."  (*Id.* ¶ 366.)  These allegations are reasonably construed as asserting a violation of 47 U.S.C. § 202, which makes unlawful:

> [A]ny common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

47 U.S.C. § 202.

Oddly, Defendants construe Plaintiffs' allegations as asserting a claim under 47 U.S.C. § 201(b).  (*See* Defs.' Mem. at 42-43.)  Section 201(b) provides, in relevant part, that "[a]ll charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice,

classification, or regulation that is unjust or unreasonable is declared to be unlawful . . ." 47 U.S.C. § 201(b).  Defendants correctly argue that any cause of action asserting a violation of Section 201(b) must be premised upon a violation of a regulation promulgated by the Federal Communications Commission that implements the "unreasonable practice" prohibition.  (Defs'. Mem. at 42); *see Global Crossing Telecomm., Inc. v. Metrophones Telecomm., Inc.*, 550 U.S. 45, 48 (2007).  Defendants argue further that Plaintiffs have not identified any FCC regulation violated by Defendants.  (Defs'. Mem. at 43.)  The Court agrees and dismisses the Communications Act claim to the extent that it arises under Section 201(b).

Defendants are silent, however, as to Section 202.  To be sure, Defendants argue in conclusory fashion that Plaintiffs have not sufficiently alleged that Defendants are "common carriers" for purposes of the Communications Act, but they provide no argument on this point. (Defs'. Mem. at 42.)  It is not the Court's duty to "scour the record, research any legal theory that comes to mind, and serve generally as [Defendant's] advocate."  *See Ernst Haas Studio, Inc. v. Palm Press, Inc.*, 164 F.3d 110, 112 (2d Cir. 1999).  Because the assertion that Unigestion and NATCOM are not common carriers is unsupported by Defendants' argument, the Court rejects this contention.  Accordingly, Defendants' motion to dismiss Plaintiffs' Communications Act claim is denied with leave to renew.

### E.  New York Banking Law § 131

New York Banking Law § 131 provides, in relevant part, "no corporation, domestic or foreign, other than a national bank or a federal reserve bank, unless expressly authorized by the laws of this state, shall employ any part of its property, or be in any way interested in any fund which shall be employed for the purpose of receiving deposits, making discounts, receiving for transmission or transmitting money in any manner whatsoever[.]"  NY Banking Law § 131.  The

statute "generally prohibits unauthorized banking in New York." *See Independent Bankers Ass'n of New York State Inc. v. Midland Bank, N.A.*, 575 F. Supp. 1425, 1427 n.2 (W.D.N.Y. 1983) (quoting NY Banking Law § 131).  Plaintiffs allege that Unibank and Unitransfer violated the statute by causing Unibank customers to deposit money into Defendants accounts through Unitransfer and charging the Fee.  (*See* TAC ¶ 374.)

Unibank and Unitransfer argue that Plaintiffs' claim must be dismissed because Plaintiffs' allegations are conclusory.  (Mem. L. Supp. Unibank S.A.'s Mot. to Dis. ("Unibank Mem.") at 7, ECF No. 145-1.)  The Court agrees.  Plaintiffs allegations are largely premised upon information and belief and provide insufficient detail to infer that Unitransfer and Unibank were operating in New York illegally.  Moreover, Plaintiffs provide no authority, and the Court is aware of none, establishing that Section 131 prevents licensed money transfer operators from transferring money to a foreign bank operating in a foreign country.  And, as Defendants point out, Plaintiffs do not allege that Unitransfer deposited any funds from United States consumers into New York bank accounts.  (Id. at 9.)  Nor do Plaintiffs allege how transfers are made into Unibank accounts.  Because Plaintiffs' allegations are both conclusory and insufficiently detailed, Plaintiffs' Section 131 claim is dismissed. See *Louros v. Cyr*, 175 F. Supp. 2d 497, 516–18 (S.D.N.Y. 2001) (dismissing Section 131 claim where plaintiff's allegations in support were conclusory). Separately, this Court, like other courts addressing Section 131, question whether these Plaintiffs have standing.  First, any injury suffered by Plaintiffs is due to the imposition of Fees, not to the act of unauthorized banking.  Second, Section 131(6) provides that those liable for violating Section 131 "shall forfeit an amount as determined by section forty-four of this chapter to the people of the state."  This language suggests that it is the New York State government, not any individual, who is entitled to enforce Section 131.

36

### F.  Personal Jurisdiction Over Natcom

Natcom contends the Court lacks personal jurisdiction because Natcom has insufficient ties with New York.  (Gov's. Mem. at 16-22.)  The Court agrees.  In determining whether a defendant is subject to general jurisdiction, New York courts look to a number of factors including: (1) "the existence of an office in New York"; (2) "the solicitation of business in the state"; (3) "the presence of bank accounts and other property in the state"; and (4) "the presence of employees of the foreign defendant in the state."  *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 58 (2d Cir.1985).  Here, Plaintiffs fail to allege any of these factors.  As the TAC acknowledges, Natcom is incorporated and has its principal place of business in Haiti.  (TAC ¶ 22.)  The only contacts that Plaintiffs allege Natcom to have with New York is a website that enables New Yorkers to purchase and use Natcom's services.  (Pls.' Gov. Opp. at 15-16.)  But that alone is insufficient to establish personal jurisdiction where, as here, the website does not target New Yorkers in particular.  *ISI Brands, Inc. v. KCC Int'l, Inc.*, 458 F. Supp. 2d 81, 87 (E.D.N.Y. 2006) (no personal jurisdiction where "the Plaintiff alleges only that the Defendant sells products nationally through an interactive website; the Plaintiff does not allege any other connections to New York").  Indeed, although Plaintiffs claim that Natcom "has tentacles in New York" by its ability to charge New Yorkers, Plaintiffs fail to plead facts to suggest that Natcom's services are "directed to New Yorkers rather than a nationwide audience."  (Pls.' Gov. Opp'n at 16); *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 253 (2d Cir. 2007).  By Plaintiffs' logic, any state where residents can access Natcom's services would automatically have personal jurisdiction over Natcom.  Not so.  *See Seldon v. Direct Response Techs., Inc.*, No. 03 CIV.5381(SAS), 2004 WL 691222, at *4 (S.D.N.Y. Mar. 31, 2004) (observing "the fact that the

posting appears on the website in every state will not give rise to jurisdiction in every state"). Thus, the Court lacks personal jurisdiction over Natcom.

## CONCLUSION

For the foregoing reasons, Defendants motion to dismiss is GRANTED, in part, and DENIED, in part. Accordingly, Defendants motion to dismiss Plaintiffs' claims for fraud, conversion, and violations of FDUTPA and N.Y. GBL is GRANTED. Defendants motion to dismiss for *forum non conveniens* is DENIED. Defendants motion to dismiss Plaintiffs' claims for violations of the Communications Act is DENIED.

SO ORDERED.

Dated: September 30, 2023
     Brooklyn, NY

/s/ LDH
LASHANN DEARCY HALL
United States District Judge

38